## Bailey et al. v. Commonwealth.

May 18, 1943.

W. R. McCoy, Earle Cassidy, and Jasper H. Preece for appellants.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellants, with Elmer Jarrell and Elsie McCoy, were by indictment charged with conspiracy to murder; murdering, and aiding and abetting in the murder, of Gladys Bailey, the estranged wife of appellant Bailey. When the case came on for trial the court sustained motion for severance by the last two above named, the Commonwealth electing to try appellants.

The jury returned a verdict of guilty, inflicting life imprisonment; motion for new trial was overruled, and judgment was entered in accordance with verdict. While there were numerous grounds set up in support of the motion, upon appeal it is contended that the verdict was contrary to the evidence; that the court should have

directed a favorable verdict for accused; that the court erred to the prejudice of accused in admitting incompetent evidence, and counsel in closing argument for Commonwealth indulged in improper and prejudicial remarks.

Gladys Bailey's body, found clinging to some rocks in Tug River on the Kentucky side, in Martin County, early on the morning of May 18, 1941, was removed several hours later. It did not develop from medical examination how long she had been dead. The proof is clear that she had been choked or strangled to death and the body dragged over rubbish and through brush down a bank from the highway to the river. Tug River is a boundary line between Kentucky and West Virginia, Martin County bordering on the west side. There is a toll bridge from Kermit, West Virginia to the Kentucky side, near a point called "Muncy's Landing." These points, with the town of Warfield in Kentucky, and other villages, are frequently mentioned in proof.

Bailey and Gladys Chaffin were married in November 1937. A child was born about three weeks thereafter, and the two separated about three months after the marriage, the wife going to her mother's home and Bailey to his mother's. Apparently the two were on friendly terms after separation, and were frequently together at various times, up to the day preceding the homicide. On the morning of the 17th Gladys left her mother's home, telling her that she was going to Crum, West Virginia, where a sister lived. Bailey had seen his wife at the mother's home on the 16th and at the sister's home on the 17th. Gladys was seen at various places about the village during the day, and around Kermit as late as 5:30 p. m. The toll collector (on the W. Va. side) said she paid toll and started across the bridge about eight o'clock. Some time after she crossed he noticed a truck come into or near the Kentucky entrance to the bridge and make a turn. However, he said that later he saw a red truck parked along the road on the Kentucky side "just about where this woman was dragged over the hill." After Gladys had crossed he saw a light colored car bearing an Ohio license, and in a few minutes a young man named Chapman crossed.

Chapman was a witness, and from his testimony it appears that he was driving a car or truck. The toll collector testified that sometime about twelve o'clock he

heard what he thought was a woman's screams; the screams were also heard by several witnesses who estimated the time from eleven to twelve o'clock. This was several hours after Gladys had passed over the bridge, and as shown by the testimony the body was dragged into the river a few hundred yards from the bridge on the Kentucky side.

The evidence by which the Commonwealth sought to fasten guilt showed that Bailey had been keeping company with Elsie McCoy, which she herself admitted, as well as the fact that he had proposed marriage to her, although he had never been divorced from Gladys; that shortly before the date of the homicide appellant had written a letter to Gladys and enclosed her some money, and had undertaken to intercept the letter before delivery. This was the basis of a theory that he had made arrangements to meet Gladys at the Kentucky end of the bridge, with the purpose of getting rid of her. The letter was not produced. There was also introduced a man's hat and comb, which were found in Chapman's Bottom, a short distance from the bridge end on the Kentucky side. Unsuccessful effort was made to show that the hat belonged to Bailey. It was shown that Elsie McCoy and a sister and two men had been about the place where the hat was found, on the night of the 17th.

There is proof that Bailey and two or three of the Jarrell boys, together at times with Dock McCoy, were seen at various times of the night riding in Bailey's truck, and there is little doubt but that at some time (about 9:30) they drove to the Kentucky end of the bridge and turned. They were seen at several points at times, ranging between 6:30 and 10:30 or eleven o'clock. Bailey and one of the Jarrells had enrolled in a night training school at Warfield. They were seen there at various times, first at 6:30, leaving after a short while, returning shortly before nine, and remaining until school closed after nine o'clock. They were seen in the truck later than this by various persons, up until one o'clock when, after taking their companions home, they went to Bailey's home.

There was an effort to prove by a number of witnesses, either that Elsie McCoy was in the truck, or that they heard a woman's voice. That Elsie was not in the truck at any time during the night appears from the evidence of numerous witnesses, two sets of whom (young

men) account for her being with them at various times from 6:30 p. m., until the early morning of the 18th. The preponderance of evidence is to the effect that at no time during the night was she with or seen by those riding around in Bailey's truck.

It is unnecessary to go further into the proof by which the Commonwealth sought to fasten guilt upon appellants, which was chiefly circumstantial. There are circumstances which may tend to show a motive on the part of Bailey to rid himself of his wife, but somewhat lacking in that quality necessary to establish guilt to the satisfaction of the jury.

The proof of the Commonwealth showed it possible for the crime to have been committed by another, or others than appellants. There was evidence to the effect that about the time a woman's screams were heard there was a large red truck parked near the point where it was shown the body of deceased was dragged from the highway to the river. The Attorney General admits that the proof did not measure up to the quality necessary to conviction.

During presentation of the testimony for the Commonwealth, six or more witnesses were permitted, over objections, to testify as to statements by Elsie McCoy (jointly indicted but not on trial), the day following and several days after the homicide. One Tina Stepp stated that on the 19th she met up with Elsie, who volunteered the information that Wallace Bailey had killed his wife. "I run into it too—all of us was together." She further described what had happened, saying that Wallace had promised to meet Gladys at the end of the bridge at nine o'clock;

"they were aiming to meet her when she crossed the bridge; he was there and had Elsie and Dorothy in the truck; she wanted to know what he meant by having her in the truck, and he said he couldn't get them out, and she said 'I can get them out.' She had a knife and Wallace said if she hurt Elsie he would kill her. Elsie and Dorothy got into a fight, and he hit her and that was the last we saw of her until they put her in the river."

Another witness said that one night after the homicide he and Elsie and her two sisters were coming up the road, and Elsie again started the subject. She told them

about the same as detailed by Tina Stepp, and further that Bailey and the Jarrell boy got Gladys by the hair and pulled her back over the seat, and broke her back and choked her. Another witness said that Elsie had told her (after the 18th) that "she and him was going to get married, and he couldn't get his divorce, and she knowed she would be killed over her." We shall not take time nor space to give testimony of four or more other witnesses who testified to similar statements, all after the homicide, and to which timely objections were made and overruled by the court.

When the Commonwealth had closed, appellants' counsel moved the court to exclude the testimony of those witnesses who had thus testified. The court overruled the motion on the ground that since Elsie McCoy was jointly indicted "both as conspirator and aider and abettor," the testimony was competent. The record shows that following this ruling there were some twenty-five or more witnesses introduced, among them Elsie McCoy, who, by the admission of the admittedly incompetent evidence, was required to go in details in denying that she had made any of the statements attributed to her. We use word "admittedly" since the Commonwealth admits the incompetency, as did the court at a belated hour.

After defense testimony was in, and the case was about to be submitted, the court sua sponte reversed his former ruling and stated that on deliberate consideration he had concluded that his previous ruling was erroneous. He then advised the jury not to consider as substantive evidence the testimony of the witnesses who had testified concerning statements to them by Elsie McCoy, including testimony of one witness who had testified as to statements made by Elmer Jarrell, who was not on trial, "as to Gladys Bailey being killed," or as to "whether or not Gladys Bailey was killed by the defendants on trial, or either of them, or either of the persons indicted in conspiracy with her death." The court added: "The remainder of said statements, if any, your recollection will be better than mine, but I will advise you not to consider this, which I have just told you, and will not be admitted." Upon objection by the Commonwealth the court added:

"The admonition only went to the extent of not considering any testimony of the witnesses purported

to have been made by Elsie McCoy and did not go to the extent of eliminating from the consideration of the jury any of the statements made as to any of the other defendants.''

The almost universal rule is that error in admitting evidence of the character here criticized is cured by admonition or instruction that such should not be considered by the jury. Hudson v. Com., 249 Ky. 845, 61 S. W. (2d) 874; Moore v. Com., 266 Ky. 514, 516, 99 S. W. (2d) 715, and cases cited. We would willingly apply the rule here were it not for the fact that it is doubtful if the jury understood the intended import of the court's admonition.. It may be questioned as to whether or not the jury conceived the meaning or effect of the word ''substantive'' as used in the admonition. If we may assume that they did, it might be concluded that they may have considered the evidence before them for contradictory or impeachment purposes. The jury should have been told that the incompetent evidence was not to be considered by them for any purpose. The form of the admonition was otherwise confusing; the jury could not analyze the suggestion that ''the admonition only went to the extent of not considering any testimony of the witnesses purported to have been made by Elsie McCoy, and did not go to the extent of eliminating from consideration of the jury any of the statements made as to any of the other defendants.'' That the evidence coming as it did, was incompetent, see Higgins v. Com., 142 Ky. 647, 134 S. W. 1135; Canada v. Com., 262 Ky. 177, 89 S. W. (2d) 880. That it was prejudicial, particularly as to appellant Jarrell, there can be little doubt. The fact that the court admonished the jury at the time and in the manner indicated, did not in our opinion remove the possible prejudicial effect, since the jury may have already formulated an irremovable belief of guilt. What we said in Kennedy v. Com., 14 Bush 340, speaking of incompetent evidence, is pertinent;

''what effect it had on the minds of the jury no one can know; * * * it is enough for this court to know that it was wrong, and may have operated to the prejudice of the appellant.''

When we come to an analysis of the proof we find ourselves faced with a rather difficult task. There may have been a sufficient showing of motive for the homicide on the part of Bailey, but not as to appellant Jarrell..

As to formation or carrying out of a conspiracy, there is considerable doubt as to sufficiency of proof; the fact that the indictment charged, and the court gave instructions on this phase of the case, somewhat complicates the consideration of the sufficiency of the evidence, surely as to appellant Jarrell.

The evidence in all, relating to the murder, the time and manner, being as it is circumstantial, and the fact that insofar as the proof here goes, coupled with the proof of defendants that they were elsewhere, brings to us what may be termed a "border line case." This being so we have concluded to reserve from, and not express in our opinion, conclusions on the question of sufficiency of the evidence to warrant a verdict of guilt, or whether the court should have given a peremptory instruction for accused. This is one case in which we may express the opinion that the court, when he reached the conclusion that incompetent evidence, and most likely prejudicial, had been permitted should have discharged the jury, or granted a new trial.

We shall not discuss at length the possible effect of the alleged improper arguments by prosecuting counsel. There is incorporated in the record of arguments of all counsel, and we are rather impressed with the suggestion of the Attorney General, that the arguments developed somewhat into an exchange of personalities, rather than, on the one side, the defense of men charged with a capital offense, or on the other, effort on the part of officers of the Commonwealth whose duty it was to see that justice was done under the law.

The court properly sustained objection to the remarks of counsel employed to assist the Commonwealth, when he said that he was not employed by the Commonwealth or the family of the deceased, but by local ministers and business men. There were references to matters not shown by proof, and perhaps some slight reference to incompetent testimony which had been withdrawn. Such were out of order. Other remarks complained of were, perhaps, justified, and not of prejudicial nature. We may say with respect of such as traveled beyond the limits, this being a very close case on facts, we might be inclined to reverse on this sole ground. This suggestion should serve as a warning in case of a new trial.

We are compelled to reverse on the dominant ground

of admission of incompetent evidence, reserving the questions suggested above, and any and all others that may have been presented in brief, with directions to the court to grant appellants a new trial consistent herewith.