## Whitaker v. Commonwealth

Feb. 8, 1944.

B. J. Bethurum and Gladstone Wesley for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellant charged with the murder of Roscoe Hinkle was found guilty and the penalty fixed at imprisonment for life. His motion for new trial was supported by ten or more grounds; those urged on appeal are: (1) The court committed prejudicial error in overruling motion for continuance. (2) In admitting over objection the testimony of a five year old boy, on grounds that he was not shown to have been properly qualified as a witness. (3) Certain incompetent testimony was prejudicial though withdrawn from the jury.

The homicide occurred about 11:30 a m., April 20, 1943. At the time Hinkle was working at the private garage of one Todd, located just outside the limits of Somerset. He was a mechanic and had been in Ohio looking for work, and upon return begun work for Todd a few days prior to the homicide. Appellant operated a grocery store where deceased had done some trading and owed Whitaker a store account, about which some dispute had arisen.

The wife of deceased testified that Whitaker had come to their home several times to collect a bill; she thought the amount owing to Whitaker was a balance of $5 on an account of $13.88. About three weeks before the homicide Whitaker had come to the home and asked for payment on the bill. Hinkle told him that he had been out of work, and that he "aimed to pay it as soon as he could." Whitaker said he wanted his money and was "going to have it." She said he had come on another occasion under the influence of liquor, and said "Roscoe (Hinkle) was a hypocrite and did not want to pay his bill;" that he had a pistol and was very angry.

Following the homicide Hinkle was found lying in the garage flat on his back, with three bullet holes on

the front of his body and two in the back. No weapon of any kind was found near Hinkle, save a file. His body was searched and disclosed a small knife in his pocket; he had a paper carton in or under his arm.

Mrs. Hahn lived about 40 feet from the garage; she saw Whitaker go into the garage, and heard Hinkle say, "I have been to Cincinnati and can't pay you," and the shooting started; she heard two shots and heard Hinkle cry, "Help, Murder, O don't," and heard three shots follow. Whitaker came out and went toward his store. Other neighbors heard the shooting and the cry of "Help, Murder," but heard nothing said before the shots, which they described as had Mrs. Hahn.

Alice Merrick testified that "about a year ago" Whitaker came to her house and said "No G. D. s. b. was going to owe him and get by with it." This was objected to and the court interposed and asked if Whitaker had called Hinkle's name, and witness answered "No." The court said to the jury, "You will not consider the testimony of this witness for any purpose." Counsel for defense moved the court to discharge the jury, and the motion was overruled with exception.

Jimmy Hahn, the five and one-half year old boy, was offered as a witness. Counsel objected because of his immature age and he was interrogated in chambers. On interrogations by the court he said he was five years old and lived with his grandmother. He knew Whitaker and Hinkle, and was in the garage watching Hinkle cleaning a file when Whitaker came in and said he wanted Hinkle to pay him; Hinkle replied he "didn't have a penny in the world," and then "Bill Jack shot him." Hinkle threw down the file and ran to the "little room." He said Whitaker shot Hinkle three times, and Hinkle hollored, "Murder, Help, Don't." On the stand the boy repeated what had been brought out by the court without material change. He did say that Roscoe, at the time, "was not trying to hurt Jack."

On cross-examination, and testing his competency, he was asked what would happen to him if he told an untruth, and replied. "Bill Jack will shoot me." He was asked about the "old bad man" and said he lived under the ground and would get him if he didn't tell the truth. Further examination was as follows:

"Who has been telling you what to state? A. Nobody.

"Has your grandmother told you what to state? A. Yes.

"Did anybody else tell you what to state? A. Yes, this big crowd here.

"Before your grandmother told you did you know what you were going to state? A. Yes, I have been in the courthouse before.

"How many times did your grandmother tell you what to state; a good many times? Have you told what she told you to tell? A. Yes."

On re-cross he was asked: "Jimmy your grandmother told you to tell the truth, didn't she? A. Yes. And that's all she told you to tell? A. Yes."

When he had finished counsel for defense asked that the boy's testimony be withdrawn; the motion was overruled with exception.

Whitaker testified that he was sixty-six years old, and had some heart ailment which interfered with his breathing. He had known Hinkle for five or six years, and there had never been any hard feelings between them "as he knew of." He had sued him and obtained an attachment six months previous to the difficulty. He said he went to the garage at about 11:30 to pick up some empty soft drink bottles. Hinkle had been in Whitaker's store that morning and had bought something. There was no trouble then. It was his habit to go and pick up soft drink bottles which the garage men had bought and taken to the garage. He said when he first went in he walked around a truck and saw Hinkle. They spoke a few words to each other and Hinkle said: " 'How much do you say I owe you yet?' and he replied, 'I don't know till I look at my books.' Hinkle said, 'I just owe you $5.00' and I said I think it is more than that, and he said 'you are a G. D. liar, you have accused my wife of lying and you are a G. D. lying s. o. b.' " He said Hinkle had a file in his hand and stepped around the truck, and drew back in a striking position and struck at him. "I jumped back and he raised it up and hit at me again, and then I shot him," with a pistol he took from his front trouser's pocket. He fired two or three times, "I don't know how many," and Hinkle checked up and said, "I'll murder you, and started at me again and I shot again; I shot him to keep him from killing me." Appellant said it was his habit to take a pistol

to his store and back to his room at night. "Sometimes I forget about having it and don't put it up for a while." He denied what Mrs. Hinkle had said on occasions of visits to her home, and admitted that he had theretofore been convicted of manslaughter.

A magistrate (relative) testified that Whitaker came to him on the day of the homicide and asked him to take him to town to surrender him and go surety on his bond. Another witness told that he came to his home and tried without success to get the sheriff's office over the phone. Both say he was sober. Other witnesses testified that they had gone to the Hinkle home with Whitaker, and he was then sober, and made no aggravating statements. The commonwealth introduced several witnesses who testified that appellant's reputation for morals and veracity was bad, with proper admonitions as to its purpose and effect. In rebuttal defense introduced four witnesses who testified that Whitaker's reputation for veracity was good; some of these were successfully attacked by the commonwealth on the question of veracity.

Appellant insists that he was entitled to a continuance for two reasons, first because of a physical disability, and second because counsel had not sufficient time to properly prepare and present his defense. It was shown that due to some heart ailment appellant was in bad physical condition. One doctor thought it would be dangerous to his health for him to go through the trial; several doctors agreeing to the existence of his ailment, did not think it would be dangerous, but it would be better for him to go through with the trial and get the ordeal behind him.

Reading his testimony, which was given in an intelligent and straightforward manner, we find no indication of discommoding disability. It was asserted in supporting affidavits that the two able counsel who represented accused were only employed on the day before the trial. However, counter affidavits showed that one of counsel had visited appellant in jail several times; appellant had conversed with him over the phone on several occasions. This attorney had been present at the examining trial on May 4th, and questioned commonwealth's witnesses. There had also been held a coroner's inquest, though it was not shown that counsel was present.

As we read the numerous affidavits, the conclusion may be reached that the delay in closing with counsel was due entirely to the failure of appellant in satisfactorily securing payment of a fee. The failure of appellant to bestir himself in preparation did not warrant him in neglecting to look to the procurement of witnesses, if any to be had. Appellant knew, or should have known at all times, what proof he would be able to produce to counter the few witnesses introduced for the commonwealth. Sebree v. Com., 260 Ky. 526, 86 S. W. (2d) 282. As we read the record, there was nothing complicated in the whole case. Appellant admitted the homicide, and under our repeated decisions it then became incumbent on him to satisfy the jury that it was committed in his self-defense. A careful reading of the affidavits does not justify us in concluding that the court abused the discretion vested in him in overruling motion for continuance.

We have quoted above the testimony of the witness who testified as to statements made about one year prior to the homicide. As noted, the court promptly withdrew consideration from the jury with proper admonition. There are very few exceptions to the almost universal rule that error in the court's admission of testimony on the character here criticised is cured by proper admonition and its withdrawal from the jury's consideration. Hudson v. Com., 249 Ky. 845, 61, S. W. (2d) 874; Moore v. Com., 266 Ky. 514, 99 S. W. (2d) 715; McIntosh v. Com., 209 Ky. 203, 272 S. W. 423. Some of these are distinguished in Bailey v. Com., 294 Ky. 355, 171 S. W. (2d) 1005.

We have also recited the testimony of the five year old boy, both in his examination in chambers and on the stand. We have had no few cases where this same question was raised, and have evolved the rule as correctly quoted by counsel from the case of Mattingly v. Com., 240 Ky. 625, 42 S. W. (2d) 874, 875, to this effect: "The rule respecting the subject is that a child offered as a witness having sufficient natural intelligence, and having been so instructed as to comprehend the nature of the act of telling the truth, and the consequence of willful falsehood, must be admitted to testify."

In the case of Wright v. Com., 267 Ky. 441, 102 S. W. (2d) 376, we were dealing with the testimony of a girl who was seven years old, and we said that there

was nothing indicating that the child did not possess sufficient intelligence to narrate truthfully the facts, and we concluded as we do here that the court did not abuse discretion in holding the witness to be competent. The court below is in better position to determine this question than are we who have only the transcript before us; he sees the witness, observes his demeanor, and we would hesitate to hold error unless it appeared that discretion had been abused. In the case of Jones v. Com., 267 Ky. 465, 102 S. W. (2d) 345, 347, wherein we reviewed several cases touching the question, we held that a girl six years old was a competent witness, since she "unmistakably indicated that she knew what she was testifying about and understandingly comprehended the facts" about which inquiry is being made. In Leahman v. Broughton, 196 Ky. 146, 244 S. W. 403, referred to in Meade v. Com., 214 Ky. 88, 282 S. W. 781, we held that regardless of the age if the infant is shown to possess sufficient intelligence and sense of obligation to tell the truth, although it is unable to comprehend the mysteries of the future life, it is competent.

An examination of the testimony of the boy here showed him to be of fair intelligence for one of his age; his testimony was not materially disturbed by cross examination, and he manifested a double reason for telling the truth. While this is the most serious question presented, we are of the opinion that the court did not err in treating the boy as a competent witness or in refusing to exclude his evidence, his credibility, of course, being a question for the consideration of the jury. A close survey of the whole record does not impress us that there was committed on the whole case any reversible error.

Judgment affirmed.