[No. 29420. Department Two. September 22, 1945.]

THE STATE OF WASHINGTON, *Respondent*, v. BURTON M. COLLIER, *Appellant*.[1]

[1]Reported in 162 P. (2d) 267.

*B. Gray Warner*, for appellant.

*Lloyd Shorett* and *Edgar R. Rombauer*, for respondent.

ROBINSON, J.—This is an appeal from a judgment and sentence entered on a jury verdict rendered after a trial on two counts, which, omitting the names of the prosecuting witnesses, read as follows:

"COUNT I: He, the said Burton M. Collier, in the County of King, State of Washington, on divers dates and days from September 15th, 1943, to March 30th, 1944, wilfully, unlawfully and feloniously did carnally know one ———— ————, a living human being and a male person with the mouth and tongue;

"COUNT II: He, the said Burton M. Collier, in the County of King, State of Washington, on divers dates and days from September 15th, 1943, to March 30th, 1944, wilfully, unlawfully and feloniously did carnally know one ———— ————, a living human being and a male person with the mouth and tongue."

Twenty-one assignments of error are submitted and discussed in appellant's two-hundred-fifty-page brief. It will

be impossible to discuss analytically all of these in this one opinion.

At the beginning of the trial, defendant moved for a separate trial on each count, "on the ground and for the reason," says the brief, "that the information did not properly advise the defendant of the charge with which he was confronted." Upon a denial of that motion, defendant moved for a continuance. That motion was also denied, and these rulings are claimed as legal errors in the first two assignments.

■ The counts which we have reluctantly quoted above, to our minds, advised the defendant of the charges with which he was confronted with painful accuracy. They were filed long before the trial. Defendant's attorney, knowing their content, did not move against them until the day of trial.

■ Furthermore, it is well established that rulings of a trial court as to matters of joinder and continuance will not be held erroneous on appeal, except in cases where abuse of discretion is manifest. In this instance, no such abuse appears.

Assignments 3, 4, 5, 6, 7, 9, 11, 13, 19, 20, and 21 question the competency of the prosecuting witness named in each of the counts to testify at all, and, in addition, it is contended that the prosecuting witness named in the first count was not legally sworn. These assignments demand full and complete consideration; for it is clear that, if that evidence was erroneously received, the judgment must be reversed and a new trial granted. But before taking up the questions raised by these assignments, it will be necessary to state the background of the case.

The crimes charged are alleged to have been committed at various times between September 15, 1943, and March 30, 1944. During that period, the prosecuting witness named in count 1 and who will be hereinafter referred to as "Butch," lived with his parents near Bothell but was accustomed to spend about every other weekend at his grandmother's home in Seattle. Butch was born on July 3, 1935, and, at the time of the trial, June 12, 1944, was within a

month of being nine years of age. His grandmother had a large house and kept a number of roomers, among them, a woman who was employed on weekdays. Her son, the prosecuting witness in count 2, attended a boarding school north of Seattle but visited his mother on weekends. At the time of the trial, he was seven and one-half years old. He will be hereinafter referred to as "Bobby." Both boys were greatly interested in the construction of model airplanes. The defendant, Collier, a twenty-nine-year-old shipyard worker, skilled in the repair of small electric motors, a trade requiring precision skill comparable, as he testified, to that of a manufacturing jeweler, also roomed in the Nelson house. His hobby, as he further testified, was the construction of model airplanes, and he kept tools and materials for that purpose in his room.

Butch testified that Collier performed the act of sodomy as to him on five occasions, the first in the early fall of 1943. He testified that he saw Collier downstairs and Collier asked him to come up to his room to see a model airplane. After Collier had shown him the plane, he put him on the bed, kneeled down, and (here the boy described the act charged with great minuteness). He further testified that, several weeks later, he again visited his grandmother, and, taking with him an airplane, went up to Collier's room to show it to him.

"Q. Then the second time that you went up there with this airplane model, what happened? A. About the same thing. Q. About the same thing. Did he have anything to do with you on that occasion, — with your physical organs? A. Yes. Q. That is what you mean when you say about the same thing. A. Yes. Q. The same type of act was performed. A. Just about. I think it was the same act. Q. It happened in just about the same way you told the Court and jury it did the first time? A. Yes."

He further testified that, about four weeks later, he again went to Collier's room, and in about fifteen minutes Bobby came in. At the time, Collier was working on the model of a Gruman Avenger. Bobby began to work on a puzzle. According to Butch, before the boys left the room, the act

charged had been committed as to both of them. On a later occasion, he was taking a model plane to show Collier and met him en route to the bathroom. Collier asked him to come along with him and show him the model.

"Q. What did you do when he asked you to come up and show it [the model] to him? A. I come up with him. Q. Come up where? To his room? A. To the bathroom. Q. What happened after you got in the bathroom? A. He took off his robe. Q. What did he do after he took off his robe? Swing around and look at the jury, then you won't be bothered so much. What happened after you got in the bathroom? A. I sat down on the chair. I thought he was going to look at the model. He opened, — he took down my trousers. [Further particulars, quite graphically and minutely described, will be omitted.]"

He testified to another instance occurring late in March.

Bobby testified that one day he went to Collier's room and found Butch there and Collier did the act to both of them.

"Q. Did he do it to you first, or to Butch first? A. Butch first. Q. After he got through doing it, what did he say to you? A. He said, 'Come on; it won't hurt.' Q. What did you say? A. First I said 'No.' Then he said, 'Come on, it won't hurt you.' Q. You let him do it? A. He coaxed me. Q. Did you do anything else in the room while you were there? A. Yes. Q. What did you do? A. He let me try his blow torch out."

We quote further from Bobby's testimony:

"Q. Now, at any time after that were you ever alone with Mr. Collier? A. Yes. Christmas Eve in the car. Q. What happened that night, Bobby? A. He did it to me in the car. Q. How did you happen to be in the car with him? A. I asked my mother — he was decorating a tree with another man. He come to see Mrs. Nelson. He come there often. He was helping decorate the tree. So I asked her if I could go down to the store with Bob. Q. Had he asked you whether you could go? A. No, I asked him. Q. How did you know he was going to the store? A. Because his wife, — whatever she is, — or girl friend, — told him to go down to the store and buy some bread. I don't know whether it was milk. Q. Did he ask you whether you wanted to go? A. I asked him, but he said to ask my mother. I went and

asked my mother, and she said yes. Q. What happened after you got into the car, Bobby? A. Well, he went down, — he went down the street a little ways, then did it to me. Q. He didn't do it while driving the car down the street, did he? A. He stopped the car and left the motor going. Then did it to me. Then did it to me. Nobody seen us. Nobody was coming along the street. Q. When you say he did it, what did he do, Bobby? [The altogether responsive and very direct answer to this question will not be quoted.] Q. Did you go home with him? A. Yes. Q. Anything happen on the way home? A. Yes, he did it to me on the way home. Only it was by the house. Q. It was when he stopped at the house that he did it? A. Yes."

■ Bobby successfully weathered a cross-examination, the transcript of which is six pages in length. The testimony designed to corroborate that of the two boys is rather slight, but, if their evidence was admissible, it is clearly more than sufficient to support the verdict.

It is said, in appellant's brief:

"The prosecuting witness [in count 1], as noted heretofore, was eight years old. He was, therefore, presumed to be disqualified as a witness in any trial and before any court in this state under Rem. Rev. Stat. § 1213 [P. P. C. § 38-7], which provides as follows:

" 'Who Incompetent. The following persons shall not be competent to testify:— . . .

" '2. Children under ten years of age *who appear incapable of receiving just impressions of the facts respecting which they were examined, or of relating them, truly.'*

"*Despite the statutory provision above*, the only test applied by the court was confined to a determination of whether or not the offered witness understood the difference between right and wrong."

■ We do not agree that the only test applied by the court was as to whether the offered witness understood the difference between right and wrong. The court tested his general intelligence. We quote a portion of this inquiry:

"Q. (By the Court) If I ask you to raise your right hand and swear to testify and tell the truth and the whole truth, do you know what that means? A. Yes. Q. Do you go to school at all? A. Yes. Q. Kindergarten? A. No. Q. Have you ever been to school at all? A. Yes. Q. (By Mr. Rombauer) What grade are you in, Butch? A. Third. Q. (By

the Court) Third grade? A. Yes. Q. Can you read? A. Yes. Q. Read the funny papers? A. Yes. Q. How old are you, Butch? A. Eight. Q. When was your last birthday? A. Last year. Q. What month did your birthday come in? A. July. Q. When? A. July. Q. When will your next birthday be? A. 4th of July. Q. 4th of July? A. Yes. Q. Well, do you know what happens on the 4th of July? A. Yes. Q. What? A. Light firecrackers and shoot them off. Q. What? A. Light firecrackers. Q. Light firecrackers. I see. Where do you live? A. Near Bothell. Q. Near Bothell. What do you like to play best? What do you like to play at best? Do you play at all? A. Yes. Q. What game do you like best? Marbles or what? What game do you like? MR. ROMBAUER: Don't be afraid. Just speak up. A. Football. Q. (By the Court, continuing) Football. You are picking out a good game there. Have you got a football? A. No. Q. Did you ever kick a football? A. Yes. Q. That's fine. Do you play baseball? A. Yes. THE COURT: I think the young lad has intelligence enough."

■ We quote from 28 R. C. L. 465, § 53:

"The capacity of an infant as a witness rests primarily with the trial judge, who sees him, and notices his manner and his apparent possession or lack of intelligence. Indeed, in some cases it has even been held that the ruling of the trial court on this question cannot be reviewed in the appellate court. However, the rule is of more general prevalence that the action of the trial court is reviewable with this limitation that since the trial judge, whose duty it is to ascertain by an examination of the infant whether he shows sufficient intelligence to be a witness, is in a better position to observe the infant's conduct, and to determine whether he possesses or lacks intelligence, than the judges of an appellate court who have only the record of the case before them, the decision of the trial court will not be disturbed unless it clearly appears from the record that he abused his discretion, or acted on a misunderstanding of the law."

This is the long-established rule in this state.

It is said in *State v. Smith*, 95 Wash. 271, 272, 163 Pac. 759:

"It is the settled rule of this court, together with most other jurisdictions, that 'the capacity of a witness of tender years is a question for the discretion of the trial judge, and will not be disturbed except in cases of manifest abuse of

discretion.' *State v. Bailey,* 31 Wash. 89, 71 Pac. 715; *Kalberg v. The Bon Marche,* 64 Wash 452, 117 Pac. 227; *State v. Myrberg,* 56 Wash. 384, 105 Pac. 622."

To these citations may now be added: *Getty v. Hutton,* 110 Wash. 124, 188 Pac. 10; *Wilkerson v. McGinn,* 110 Wash. 454, 188 Pac. 472; *State v. Priest,* 132 Wash. 580, 232 Pac. 353; *State v. McMullen,* 142 Wash. 7, 252 Pac. 108; *State v. Standish,* 14 Wn. (2d) 39, 127 P. (2d) 255; all of which are to the same effect.

■ However, it is scarcely necessary to invoke this rule; for the two boys testified, and the record of their testimony is before us. Collier, testifying on his own behalf, corroborated practically everything the boys said, except, of course, he denied that the criminal acts were committed. He testified he first met Butch on September 19, 1943; that the boy came to his room with model plane parts and remained an hour and a half, and at another time he came up to see a Sikorsky model which the defendant was constructing; and that he helped the boy to put together a Gruman Avenger. He testified further that Bobby came to his room on several occasions, and once or twice when Butch was there. On one or two occasions, the two boys stayed in his room for an hour and, during the visit, played with a blow torch; all of which appears in the testimony of the boys. He also admitted that Butch did accompany him to the bathroom on one occasion; that he talked to Butch about an airplane while he shaved, but that the boy left before he took off his bathrobe. He thought this occurred in February or March, possibly in April. He was no more definite about dates than the boys were. A comparison of defendant's testimony with theirs, when all direct testimony as to the alleged criminal acts is omitted, demonstrates that they were, in fact, fully as capable of receiving just impressions of facts and relating them truly as he was.

While Butch was on the witness stand, the prosecuting attorney gave the boy a pad and asked him to lay it on his lap, draw a diagram of Collier's room, and mark the location of the principal articles of furniture therein. He did so, and the rough sketch is in evidence as an exhibit.

The room was very irregular in shape. From the square, central room, narrow hall-like alleyways extend out from two sides to windows. There is also a closet protruding from one of the remaining sides. The boy located these extensions with accuracy, and marked the position of the door, of each of the two windows, of the bed, the work-bench, the radiator, a bookcase, a dresser, a record case, and two closets. Later, during the trial, defendant's counsel had the defendant make a pencil sketch of his room. It is also in the record. The lines are straighter, the writing thereon is better, but the floor plan of the room, with all its irregularities, is exactly the same in every respect as in the sketch drawn by the boy at the beginning of the trial, and every window, door, closet, the bed, radiator, bookcase, etc., are in the same positions as they appear in the sketch made by the boy the day before. We can have no doubt but that he was capable of receiving true impressions of the facts concerning which he was examined, and of relating them truly.

When called to the stand in his own defense, Collier testified, in part, as follows:

"Q. Did you go out in an automobile with Bobby at any time? A. Yes. Q. When was that, Mr. Collier? A. I believe it was just either the day before or Christmas or right in that vicinity of that time. It seemed that Miss Melheim needed a loaf of bread from the store. I remember that Bobby asked to go. I told him that he would have to ask his mother himself. He wished me to ask her for him; but I told him he would have to ask her himself. Q. Did he ask her? Do you know whether he asked her or not? A. I was just coming downstairs. I heard him ask Mrs. ———— [Bobby's mother]. Q. He went with you? A. Yes."

As we have shown by a previous quotation, Bobby testified to these exact details the day before. His testimony is as clear, lucid, and exact as the testimony of the defendant, which has just been quoted.

We hold that both boys satisfied the test of competency required by Rem. Rev. Stat., § 1213.

It is contended, however, that they were incompetent for another reason, to wit: That they did not appreciate

or understand the obligation or nature of an oath. In answer to questions put by the court, Bobby testified that they recited prayers at his school; that he said his prayers at night, but not every night; that he knew it was wrong to lie or steal; that the Bible was about Jesus, and more to the same general effect. His examination along this line concluded, as follows:

"Q. (By the Court, continuing) Do you understand, Bobby, if I tell you to take an oath and raise your hand? A. Yes. Q. What does it mean? A. To tell the truth."

Butch said that he knew the difference between good and bad, and that the devil would get him if he was not good and told lies, and asked, "What happens to little boys that steal and do not tell the truth?" answered: "They go to the reform school." When asked, on cross-examination: "What is the Bible?" he answered: "All about the truth and the Devil." In answer to the question, "Is it wrong to lie?" he answered: "Yes." He was wholly unable to deal with the question of "Who is God?" except to say: "I know he never told a lie." We may observe, parenthetically, that a good many adults would have some difficulty with that question.

It is also contended that all witnesses must be sworn, and that Butch was not sworn. As these contentions are interrelated, they will be discussed together, in the light of our constitutional provisions and statutes:

"The mode of administering an oath or affirmation shall be such as may be most consistent with and binding upon the conscience of the person to whom such oath or affirmation may be administered." (Const., Art. I, § 6.)

There is another constitutional provision, which neither counsel has cited, which has a distinct bearing upon the questions now under discussion. We quote a portion of § 11 of Art. I:

" . . . nor shall any person be incompetent as a witness or juror in consequence of his opinion on matters of religion, . . ."

In *Fernandez v. State*, 16 Ariz. 269, 144 Pac. 640, in which the competency of an Indian woman was questioned, on the

ground that she did not understand the nature of an oath, the court said, in part:

"On her *voir dire,* she said she understood what an oath was, but in answer to the question, 'Do you understand what the result would be if you were to tell a lie?' her answer was that she would tell no lie, or that she would 'show what she had seen, that's all.' . . . At most, her answers showed that she did not understand the full technical meaning of the common-law oath, such as fear of punishment by the Supreme Being in this world or in the world to come for false swearing. . . .

"Questions were asked to test the witness' belief in God or the Great Spirit.. The question should not have been put to the witness. Section 12, article 2, of the Constitution, provides: [This provision of the Arizona Constitution is, in its every word, identical with the section we have just quoted from § 11 of Art. I.]"

Section 4 of Art. I of the constitution of California provides:

"No person shall be rendered incompetent to be a witness or juror on account of his opinions on matters of religious belief."

In *People v. Delaney,* 52 Cal. App. 765, 199 Pac. 896, the child whose competency was questioned on appeal was four years and two months old. On appeal, the court held that his competency to appreciate and truly relate facts had not been sufficiently shown, but that he was entirely competent from the standpoint of moral responsibility. After saying that no person, child, or adult may be excluded from the witness stand on account of his opinions on matters of religious belief, citing Art. I, § 4, of the California constitution, the court said:

"In the instant case, so far as the child's sense of moral responsibility is concerned, it was enough that his mother, as the boy told the trial judge, had taught him to tell the truth, and that he thought that little boys who do not tell the truth would be punished by being put in jail. Without doubt, he had no comprehensive conception of the nature of that kind of punishment; but it is sufficient that he understood that some, even if unknown, evil would befall him should he depart from the truth. A child who understands

that he will be punished on earth is competent, although he know nothing of punishment after death. [Citing cases.] For these reasons we think that, to qualify a child under ten years of age, upon the score of his moral responsibility, it is sufficient that he understands that it is his duty to tell the truth and that he will somehow be punished if he does not. The rule is thus stated in Cyc.: 'It is held sufficient to qualify the child that he understands the difference between truth and falsehood, and his duty to tell the truth, and that he will be punished if he testifies falsely, although he does not understand the legal nature of an oath or appreciate the formality of taking it, as, from a legal standpoint, one who has an adequate sense of the impropriety of falsehood understands the nature of an oath, although not able to define it.' (40 Cyc. 2204.)"

While the rule is not stated as strongly in Ruling Case Law, that publication arrives at substantially the same conclusion:

"There is some conflict among the cases as to how far the competency of a child to understand the obligation of an oath depends on belief with respect to punishment after death. In some cases it is held that he must feel the obligation of the oath from religious convictions, and not merely from the sense of impropriety of telling a falsehood or fear of bodily punishment. . . . This requirement, though sometimes strictly exacted, if given its true import, would seem in a majority of cases nothing more or less than a recognition as essential that the infant appreciate the obligation of an oath, and has the ability truly to recount his impressions; and it has been pointedly held that infants, although ignorant of future rewards and punishments and the impiety of falsehood, are competent as witnesses." 28 R. C. L. 462, § 49.

■ This court has not hitherto dealt directly with this question, and, as the exact matter involved is one of first impression, we have made a wide, though not an exhaustive, search of the authorities. It is our opinion that the majority rule is as stated in the quotation above made from Cyc. and Ruling Case Law. We quote from a few illustrative decisions by other courts.

In *State v. Ybarra*, 24 N. M. 413, 174 Pac. 212, the defendant was convicted of first-degree murder. It was

urged, on appeal, that the testimony of a child of tender years (exact age not stated) was erroneously received. The court said, in part:

"On his *voir dire* examination the witness testified that he did not know how old he was; that he knew it was wrong to tell a lie; that he knew it was right to tell the truth, and that he understood when he swore that he was to tell the truth; that he intended to tell the truth, and that he knew what it meant to take an oath. He was then asked what it meant to take an oath and replied that he did not know; that his father had told him what it was, but that he did not remember. He was then asked, 'Don't you know what it means when you are telling the truth; do you know whether it is right or wrong?' And he answered, 'I know it is right to tell the truth.' He was then asked: 'When you swore to tell the truth, what does it mean? Does it mean that you will tell the truth or not?' And he answered, 'Yes, I am going to tell the truth.' . . .

"The fact that a child states in express terms that he does not understand the nature of an oath is not of itself sufficient ground for his exclusion as a witness, where it clearly appears that the child has sufficient intelligence to understand the nature of an oath and to narrate the facts accurately, and knows that it is wrong to tell an untruth and right to tell the truth, and that if he told an untruth he would be punished, and, from other facts, that he is in fact competent. 7 Ency. of Evidence, 274. In *Williams v. United States*, 3 App. D. C. 335, the court said:

" 'Courts of justice should regard substance, not words. A child that has an adequate sense of the impropriety of falsehood does understand the nature of an oath in the proper sense of the term, even though she may not know the meaning of the word "oath" and may never have heard that word used.' "

In *Mattingly v. Commonwealth*, 240 Ky. 625, 42 S. W. (2d) 874, another first-degree murder case, the reviewing court said:

"Willis Gibson, a boy of eleven years of age, was permitted to testify against appellant over his objection, and he now insists that the boy was so immature and so ignorant of the nature of an oath that he was wholly incompetent as a witness. A preliminary examination of the witness was conducted by the trial court in which the boy stated he knew the meaning of the truth, and how to tell it, al-

though he did not know that he could be put in jail for perjury. He stated that he would tell the truth, as near as he could. His testimony upon the trial, as reported in the transcript of the evidence, is coherent and clear and entirely consistent with testimony given by other witnesses. . . . The rule respecting the subject is that a child offered as a witness having sufficient natural intelligence, and having been so instructed as to comprehend the nature of the act of telling the truth, and the consequences of willful falsehood, must be admitted to testify. The question becomes then one of credibility and not one of competency. [Citing cases.] The trial court, in this case, did not err in admitting the testimony of the Gibson boy. The jury had a right to hear his testimony and to give it such weight as it merited."

In *Whitaker v. Commonwealth*, 297 Ky. 279, 179 S. W. (2d) 448, also a murder case, it was contended that the testimony of a boy five and a half years old had been erroneously admitted. The court, in rendering its decision, quoted the rule set out in the *Mattingly* case, and added:

"In *Leahman v. Broughton*, 196 Ky. 146, 244 S. W. 403, referred to in *Meade v. Com.*, 214 Ky. 88, 282 S. W. 781, we held that regardless of the age if the infant is shown to possess sufficient intelligence and sense of obligation to tell the truth, although it is unable to comprehend the mysteries of the future life, it is competent."

In *Durham v. State*, 179 Ark. 507, 16 S. W. (2d) 991, the court ruled, as follows:

"The child upon whom the assault was alleged to have been committed was allowed to testify, and it is urged that the court erred in allowing her to do so. Before she was permitted to testify, the trial court examined her as to her competency. She was six years old, and stated that she had been to Sunday-school, where she was taught that if she told a lie she would go down to the bad-man. She also stated that if she told a story she would be sent to the jail house. She appeared small for her age, but was intelligent looking. . . . The trial court was justified, from the examination of the witness, in finding that she had sufficient intelligence to know what she was testifying about and that she understood the obligation of an oath and the punishment that might follow from swearing falsely. Hence we hold this assignment of error was not well taken."

It was contended, on oral argument, that Butch's answer to the question put to him by defendant's counsel, "What happens to little boys that steal and do not tell the truth? A. They go to the reform school," showed that Butch had no real conception of the obligation of an oath. We quote from the opinion in *People v. Elroy*, 94 Cal. App. 355, 271 Pac. 346:

"The sole point upon appeal is that the court erred in permitting a girl nine years and nine months of age to testify against the defendant. Upon examination of this witness by the court she testified that she was nine years old, attended school in the high third grade, that she had testified previously at this trial, that the oath required her to tell the truth and that girls who did not tell the truth would be sent to the reform school. . . . The point is not well taken."

The following excerpts are from the decision in *Gonzales v. State*, 113 Tex. Crim. App. 439, 22 S. W. (2d) 674, in which the defendant was convicted of murder:

"Appellant offered as a witness his daughter who was nine years old. Upon examination by the court she testified that she would be punished if she told a story, but said she did not know who would punish her or how she would be punished. She further said she did not know what it meant to swear. Touching the transaction resulting in the homicide she gave testimony in the absence of the jury supporting her father's theory of self-defense."

The court refused to let her testimony go to the jury, and the defendant-appellant assigned this as error. The appellate court held:

"While the admission of a child's testimony is properly within the sound discretion of the trial court, where the abuse of such discretion is apparent the action of the trial court thereon will be revised on appeal. . . . Here the witness said, in effect, that it was wrong to lie and that one who did not tell the truth would be punished. Her testimony touching the transaction with respect to which she was interrogated was intelligently given. We are driven to the conclusion that she should have been permitted to testify.

"The judgment is reversed, and the cause remanded."

We quote also from *Wheeler v. United States,* 159 U. S. 523, 40 L. Ed. 244, 16 S. Ct. 93:

"The remaining objection is to the action of the court in permitting the son of the deceased to testify. The homicide took place on June 12, 1894, and this boy was five years old on the 5th of July following. The case was tried on December 21, at which time he was nearly five and a half years of age. The boy, in reply to questions put to him on his *voir dire,* said among other things that he knew the difference between the truth and a lie; that if he told a lie the bad man would get him, and that he was going to tell the truth. When further asked what they would do with him in court if he told a lie, he replied that they would put him in jail. He also said that his mother had told him that morning to 'tell no lie,' and in response to a question as to what the clerk said to him when he held up his hand, he answered, 'don't you tell no story.' . . . Of course, care must be taken by the trial judge, especially where, as in this case, the question is one of life or death. On the other hand, to exclude from the witness stand one who shows himself capable of understanding the difference between truth and falsehood, and who does not appear to have been simply taught to tell a story, would sometimes result in staying the hand of justice.

"We think that under the circumstances of this case the disclosures on the *voir dire* were sufficient to authorize the decision that the witness was competent, and, therefore, there was no error in admitting his testimony."

But it is further contended that Butch was not sworn as a witness, and that his testimony should, therefore, be wholly disregarded. After he had been questioned by the trial judge, he was instructed to stand up and raise his right hand:

"THE COURT: You are promising what you are going to say as a witness that you will tell the truth, all of the truth, and nothing but the truth, so help you God. You promise that, do you? THE WITNESS: Yes."

Appellant contends that this is not a compliance with the statute. Chapter 7 of title 9, Remington's Revised Statutes, is entitled, "Oaths and Affirmations," and contains six sections, §§ 1264 to 1269 [P. P. C. §§ 41-1 to 41-11], inclusive. The language used in nearly every section of

the chapter indicates that the legislature did not intend the statute to be mandatory. The length to which this opinion has arrived precludes quotation in full. We quote, as illustrative, a portion of § 1265 [P. P. C. § 41-3]:

"An oath *may* be administered as follows: The person who swears holds up his hand, while the person administering the oath thus addresses him: 'You do solemnly swear . . .'" (Italics ours.)

It will be noted that the statute says: "An oath may be administered as follows: . . ." While the word "may," when used in statutes, is sometimes construed to mean "must," such a construction in this instance would render the statute unconstitutional. As we have hitherto seen, § 6 of Art. I of the state constitution reads as follows:

"The mode of administering an oath or affirmation shall be such as may be most consistent with and binding upon the conscience of the person to whom such oath or affirmation may be administered."

This constitutional provision gives a wide discretion as to the mode of administering an oath. The administering officer is, in fact, commanded to employ that mode which he believes will be most binding upon the conscience of the witness. It is clearly not within the power of the legislature to prescribe a set form and require its use in every instance, and, in our opinion, it has not attempted to do so.

At the close of the state's case, defendant's counsel moved to strike all of the testimony given by Butch, on the ground that it had not been given under oath. In denying the motion, the trial judge said, in substance, that he had used the word "promise" because he felt, at the conclusion of the *voir dire* examination, that the boy would fully understand the word "promise," and would be more impressed by it than by the word "swear." This appeals to us as entirely reasonable. To an eight-year-old boy, the word "swear" would very likely connote swearing of quite a different sort than is involved here, while the word "promise" would be thoroughly understandable. At all events, we cannot hold that the action of the trial judge, in not following the form suggested by the statute with complete

exactness, was an abuse of the wide discretion so clearly vested in him, and, indeed, enjoined upon him by the constitution.

Among the remaining assignments of error, at least one other requires serious consideration. It arises out of the following circumstances: Butch testified to at least five instances of the commission of the offense charged in count 1. When he had finished describing the first instance, the examination continued as follows: "Q. What happened after that? A. Then he asked me to do it to him. Q. And did you? A. Yes."

Defendant's counsel moved that the last answer be stricken. The motion was denied, and exception taken and allowed.

After Butch had testified to the third act of the series, the prosecutor inquired:

"Q. What happened after he did it to you?" and the boy replied: "I did it to .him." The defendant thereupon moved for a mistrial and excepted to the·denial of the motion. At the time these incidents occurred, defendant's counsel stated his position in the matter which, as elaborated in his brief, is substantially as follows: (1) Count 1 is based upon a statute which defines two distinct crimes; (2) the count charges the commission of the first of these only; (3) it was error to admit proof of the other crime, and, since the testimony was of such a nature as to tend to arouse violent prejudice against the defendant, the verdict on both counts should be set aside.

The counts were based upon Rem. Rev. Stat. (Sup.), § 2456 [P. P. C. § 113-69], the material portion of which is as follows:

"Every person . . . who shall carnally know any male . . . person . . . with the mouth or tongue; or who shall voluntarily submit to such carnal knowledge; . . . shall be guilty of sodomy . . ."

We agree with appellant's counsel that, under this section, the defendant could have been charged with the crime of voluntary submission to carnal knowledge, and that the testimony of which he complains, therefore, tended to prove

a crime with which he was not charged; and we further agree that, if that evidence was erroneously admitted, the verdict as to both counts should be set aside. But was it erroneously admitted? The state, in its brief, contends that it was admissible under the *res gestae* rule, and it is further said:

"We feel that this Court can judicially recognize the fact that mature males who indulge in this type of perversion with children of this age do so with the ultimate object in mind that the act will be performed upon them by the juveniles."

 We have some doubt concerning the first position taken by the state and, as to the second, will merely observe that it attributes a greater fund of judicial knowledge to this court than it is disposed to lay claim to. We think, however, that the evidence complained of was admissible. Many cases could have been cited to that effect, including a number from our own reports.

In *State v. Tilden*, 79 Wash. 472, 140 Pac. 680, a seduction case, the court said:

"Offenses involving carnal intercourse of the sexes furnish a well-recognized exception to the general rule excluding evidence of other like crimes. For a reason peculiar to those crimes, the rule has been most liberally extended, until it may be safely asserted that, where the charge is made of the commission of any of the crimes known as sexual offenses, evidence of prior acts of the same character is admissible, even though such prior act is itself a crime. [Citing cases, textbooks, and L. R. A. note.]"

In *State v. Oberg*, 187 Wash. 429, 60 P. (2d) 66, the information contained three separate counts, each charging sodomy, committed on the persons of three different boys. The court said, in that case:

"The general rule excluding evidence of offenses, distinct and different from that for which the defendant is being tried, does not apply to offenses involving carnal intercourse committed upon the same person. . . .

"Such evidence is admissible on the principle and theory that antecedent conduct and demeanor of the parties towards each other tends to show the probability of the com-

mission of the specific act charged and to corroborate the testimony of the prosecuting witness. [Citing earlier Washington cases.]"

It will be noted that the foregoing speaks of "antecedent conduct." As we have seen, the prosecuting witness testified to five successive acts. The testimony objected to is concerned with conduct which was at least wholly antecedent to the fourth and fifth acts, and there was no attempt made to require the prosecutor to elect on which of the five acts he relied for conviction. We again quote from the *Oberg* case:

"Such evidence may have the effect, at times, of rendering uncertain which of several proven crimes the information was intended to charge. But, in such case, the proper way to make ascertainment is to require the prosecutor to elect on which act he intends to rely for conviction. [Citing cases.] That was not done in this instance. But, even if the prosecutor had been required to elect the specific act upon which he would rely for conviction, that would not have had the effect of excluding evidence of other similar acts."

The rule of the *Tilden* and *Oberg* cases, and earlier cases therein cited, has been recently reaffirmed and applied in *State v. Jordan,* 6 Wn. (2d) 719, 108 P. (2d) 657, and still more recently in *State v. Swane,* 21 Wn. (2d) 772, 153 P. (2d) 311, in which case, as in the *Oberg* case, three counts charging sodomy as to three different boys were joined in one information.

Three of the remaining assignments of error relate to the court's refusal to give requested instructions, and another relates to one of the instructions given. We find the instructions given comprehensive and adequate, and free from errors of law.

It is also assigned as error that the court made repeated prejudicial comments on the evidence before the jury. This assignment is, in our opinion, not sustained by the record.

It is further assigned as error that the deputy prosecuting attorney who tried the case was guilty of misconduct in

several particulars, one, in introducing evidence of a crime not charged. We have already disposed of that matter. It is also contended that he persistently asked leading questions in examining the boy witnesses. In our opinion, this is not borne out by the record. In fact, we think, in view of the rule laid down in *State v. Tenney*, 137 Wash. 47, 241 Pac. 669, and previous decisions therein cited, that he exercised commendable restraint.

Finally, it is said, in appellant's brief:

"This was a serious case. From the mere charge itself it could be anticipated, that the jury would consider the nature of the charge prejudicially, particularly where small children were involved. It is the type of charge similar to rape which is easy to assert and hard to disprove, and this fact is recognized by all experienced practitioners and the courts and needs no citation."

We recognize, of course, that this is a serious case. Although the punishment provided is not as great, there are those who consider the crime involved here as more repellent than the crime of murder, and the charge itself is such as to engender prejudice even in the most disciplined minds. It is further true that the charge is of a kind that is hard to disprove, and one which almost invariably forces the defendant to testify in his own defense and thus submit himself to cross-examination. We have kept these things in mind throughout our examination of the record, but we have found no legal error, and, as to the facts, we are concluded by the verdict of the jury. Even if this were not so, and it were open to us to weigh the evidence, we would be compelled to sustain the verdict, and, therefore, the judgment and sentence appealed from.

The defense was very weak. An attempt to show that the case grew out of a rental dispute between the defendant and the grandmother of one of the prosecuting witnesses was completely abortive. The defendant was compelled to rely upon the testimony of two or three not very impressive character witnesses, and his own denials. These denials are weakened by the fact that his testimony agreed with that of the two boys in substantially every de-

tail, except that he denied the actual commission of the acts charged. His denials were further weakened by the fact that, soon after he took the stand, his counsel felt compelled (presumably in anticipation of like action by the prosecuting attorney) to inquire as follows:

"Q. Incidentally, before we go further, have you ever been convicted of a crime? A. Yes. Q. What was that? A. Contributing to the delinquency of a minor. Q. Was it a boy or girl? A. A girl. Q. Was there sodomy involved in that? A. No, there was not. Q. The girl, incidentally, in the case was who, — not her name, but what relationship to you? A. Stepdaughter."

The judgment and sentence appealed from is affirmed.

BEALS, C. J., BLAKE, SIMPSON, and MALLERY, JJ., concur.