**LUJAN v. UNITED STATES.**
No. 4663.

United States Court of Appeals
Tenth Circuit.
Dec. 21, 1953.

See also, 204 F.2d 171.

Arturo G. Ortega and J. C. Ryan, Albuquerque, New Mex., for appellant.

Paul F. Larrazolo, U. S. Atty., and Melvin L. Robins, Asst. U. S. Atty., Albuquerque, New Mex., for appellee.

Before BRATTON, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

Cesario Lujan, an Indian resident of the Taos Pueblo in the District of New Mexico, appeals from a judgment and sentence after conviction for assaulting another Indian, Sam Archuleta, with a dangerous weapon, in the Taos Pueblo on the 6th day of November, 1952, in violation of Section 1153 U.S.C.A. Title 18.[1]

---

1. Section 1153 provides in material part, "Any Indian who commits against the person or property of another Indian * * * assault with a dangerous weapon * * * within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

On the commencement of the trial the court called an Indian named John Concha to be sworn to act as the interpreter for the non-English speaking Indian witnesses in the case. Before he was sworn, the defendant objected to Concha as an interpreter on the grounds that he was a blood relative of some of the witnesses for whom he would interpret and was biased on behalf of the government. The Appellant now complains of the use of Concha as an official court interpreter contending that he was prejudiced thereby.

In response to the objection the trial court observed that it was not good policy to use a relative of any of the parties or witnesses in the trial of the case as an interpreter, and recessed to allow the parties to obtain another interpreter. When the parties were unable to find another one, the court decided to proceed with Concha as the interpreter, and another Indian named Tellesfor representing the defendant as a "counter-interpreter." After Concha was sworn, he was cautioned concerning his duties, and the court announced that Concha would be used to interpret for the government's witnesses, and Tellesfor would be used to interpret for the defendant's witnesses. During the production of the testimony by interrogation of non-English speaking Indians, Tellesfor sat at the defendant's counsel table and from time to time made suggestions and corrections concerning the interpretation of the testimony by the official interpreter.

At the noon recess and after the examination of one Indian government witness through the interpreter, the court commented on the impossibility of literally interpreting the Indian language into the English language, and vice versa, and that the interpreter must necessarily use a certain amount of judgment in interpreting the meaning and import of each question and answer. It called attention to the apparent satisfactory manner in which the interpreter had performed his duties, pointing out that only one or two immaterial corrections had been suggested by the counter-interpreter. At that point both parties, in response to the court's specific inquiry, agreed that the interpretation had been fair and impartial.

Throughout the trial of the case Concha was used as the official interpreter for government Indian witnesses, and Tellesfor was used as the official interpreter for the defense Indian witnesses. Only a few minor corrections were suggested by the counter-interpreter.

While in the nature of things, a disinterested interpreter is essential to an impartial interpretation of a witness' testimony, at the same time the trial court is necessarily accorded a wide discretion in determining the fitness of the person called, and the exercise of that discretion will not be disturbed on review in the absence of some evidence from which prejudice can be inferred. See People v. Valencia, 27 Cal.App. 407, 150 P. 68; People v. Rardin, 255 Ill. 9, 99 N.E. 59; DeBaca v. Pueblo of Santo Domingo, 10 N.M. 38, 60 P. 73; See annotation 172 A.L.R. 923, 941, Subsection (c).

There is nothing in this record to indicate or from which it can be inferred that any part of any witness' testimony was misinterpreted to convey an erroneous meaning or impression to the jury. We conclude that the use of the sworn interpreters was not prejudicial.

To prove the allegations in the indictment, the government introduced testimony to the effect that on the early evening of November 6 the Appellant came to his apartment in the Indian pueblo in a drunken condition, and quarreled and fought with his wife. When his mother-in-law living next door heard the commotion and came to the apartment with a grandchild in her arms, he also attacked her. When his father-in-

---

The Pueblo of Taos in New Mexico is "Indian country" within the meaning of the statute. See United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107. The district court therefore has jurisdiction of the offense.

law came to the rescue, they became involved in a fight. When Appellant's wife went for help, another Indian came into the apartment and separated the Appellant and his father-in-law by holding Appellant's arms behind him until the father-in-law left the apartment. Soon thereafter he became involved in a fight with his brother-in-law, Sam Archuleta, outside of his apartment and in front of the Archuleta apartment. After struggling with each other at close grips, Sam Archuleta quit the affray and started toward the door of his apartment, whereupon Appellant stabbed him in the back with a pair of scissors. He entered his apartment and fell bleeding to the floor.

Appellant testified in his own behalf to the effect that he came to his apartment in a drunken condition on the evening in question, and after quarreling with his wife, struck her on and about the face. He testified that he was attacked in his apartment first by his mother-in-law, then by his father-in-law, and that when his brother-in-law came to the apartment, they became involved in a fight. That while struggling on the floor and being choked by his brother-in-law, Appellant in some unexplainable manner grabbed the scissors from the floor and stabbed his brother-in-law in the back.

The defense was that he stabbed his brother-in-law while in such a position that he, the Appellant, could not flee in order to protect his life, and that he took the necessary means to protect himself in grabbing what he could find to defend himself while being choked by his brother-in-law.

The Appellant complains of the instructions of the court to the effect that as a rule a mere attack with fists is no excuse or justification for the use of a dangerous weapon. Quoting from 26 Am.Jur. 255, § 142, it is said, "An assault with fists may be sufficient under some circumstances to create a belief that it is necessary to kill," and that the instructions of the court had the effect of vitiating his plea of self defense.

Of course, if the challenged statement in the instructions is construed to exclude an assault with fists as justifying the use of a deadly weapon in self defense, the instruction may be subject to criticism on that score.

But the Appellant apparently overlooked the next sentence in the quoted treatise to the effect that a fistic assault is sufficient to create a reasonable belief of the necessity to use a deadly weapon "only in extreme cases, for a blow with the hand can hardly be deemed to warrant a resort to a deadly weapon." Accepting this whole statement as applicable to an assault with a deadly weapon, we think it does no more than support the trial court's explanation that as a rule a mere attack with fists was no excuse or justification for the use of a dangerous weapon.

In any event the statement, considered in its proper context, did not deprive the Appellant of his plea of self defense. The court was at pains to instruct the jury in accordance with ancient and accepted rules that "if a person is assaulted with such fierce force and violence by another that his own life is threatened, or is in great danger of receiving great bodily harm, then he may resort to whatever means may be necessary to repel the assault and to protect himself from great bodily harm, or in the defense of his own life. A person is not required to flee from an assailant, and he may stand his ground and defend himself." The jury was further told, however, that "in order to constitute a legal excuse or justification or justify the use of a dangerous weapon in protecting one's self, the assault must be so fierce and so violent that the person assaulted, as a reasonable man, actually believes it is necessary to use a dangerous weapon to repel the assault and * * * safeguard his own life." Then followed the statement that "a mere attack with fists, a fist fight, is no excuse and no justification for the use of a dangerous weapon." But the court did not stop there. It went on to tell the jury that it expressed no opinion

whatever about the facts and circumstances of the case. That it was for them to determine from the evidence whether the self defense interposed by the defendant in the case was based upon truth and that the use of the deadly weapon was to protect himself as a reasonable man from receiving great bodily harm or in the defense of his life, or whether it was a mere pretext.

The ultimate question whether the fistic assault, if one did in fact occur, justified the use of the deadly weapon, was thus left for the determination of the jury. The court's comment that as a rule a mere attack with fists, or fist fight, was no justification for the use of the dangerous weapon did not deprive the Appellant of his plea of self defense. It merely stated the legal standard by which it should be judged. We think the instructions clearly stated the law and that they were eminently fair to the Appellant's plea under the testimony. See Josey v. United States, 77 U.S.App. D.C. 321, 135 F.2d 809.

▆▆▆▆ To discredit the testimony of the government witnesses on the vital issue of self defense, Appellant's counsel on cross examination of the Archuleta family sought to elicit from them the fact that they were embittered against the Appellant and his family because of a forced marriage between the victim, Sam Archuleta, and the Appellant's sister.

Each of the witnesses denied any ill will toward the Appellant or his family prior to the present incident. Archuleta admitted marriage to the Appellant's sister after pregnancy, but denied that he was forced to marry her or was unhappy about it.

To impeach the prosecuting witnesses by showing biased hostility toward Appellant, Appellant sought by his father's testimony to show the details of the marriage of Sam Archuleta and his sister. In sustaining the objection to the proffered testimony the court commented that Sam Archuleta did not deny the facts of the marriage and that the details with respect thereto were therefore inadmissible for purposes of impeachment.

In the use of discrediting evidence a sharp distinction is drawn between cross examination of the witness sought to be impeached and extrinsic testimony on the impeaching issue. The latitude accorded on cross examination does not obtain with respect to extrinsic evidence. See Wigmore on Evidence, Second Edition, Vol. 2, Page 242, § 878. While the courts seem to have accorded a wider latitude for the admission of extrinsic facts bearing on the issue of bias, the scope of the inquiry is not unlimited and may be restricted largely in the discretion of the trial court. Wigmore on Evidence, Second Edition, Vol. 2, Page 332, §§ 948–950. For example, the details of a quarrel relied upon to establish bias and prejudice of a witness may be limited in the trial court's discretion where they may lead to "multifariousness and a confusion of issues." See § 951, Wigmore on Evidence, supra. It is important to keep in mind that the defendant, not the witness, is on trial and that the central issue to be determined in a criminal case is the guilt or innocence of the defendant. And it certainly is within the province, and indeed the duty of the trial court to make sure that collateral issues are not injected into the case in a manner to confuse the jury by clouding the triable issues. Meeks v. United States, 9 Cir., 179 F.2d 319.

The issue in this case was the guilt of the Appellant for assault with a dangerous weapon, not whether his victim's marriage to his sister was forced from illicit circumstances. If the court permits the testimony of the details and circumstances on the one hand, fairness compels him to admit rebuttal testimony, and so on *ad infinitum*. The orderly processes of the administration of justice require the court to keep such collateral issues within bounds. We do not think the trial court's refusal to admit the extrinsic evidence in this case reversibly restrictive.

▆▆▆▆ To further discredit and impeach the testimony of the Archuleta

family, the Appellant introduced evidence to the effect that their reputation in the pueblo for truth and veracity was bad. On cross examination of the character witnesses they were asked if they were not users of peyote—a form of drug addiction. One of the witnesses answered affirmatively, and the question immediately arose whether the witness knew the true meaning of his answer. Counsel for the Appellant suggested at that time that the use of peyote had a great religious significance in the pueblo. The trial court also indicated that the use of the peyote bean was a cause of dissension in the pueblo; that efforts had been made to stamp it out. After further discussion the matter was left with admissions on the part of the witness Martinez that he was a user of peyote juice. On a motion for a new trial, the Appellant offered documentary proof to the effect that peyote juice was used as a sacrament in the observance of certain religious rites practiced by some of the pueblo Indians, and on appeal it is argued that the trial court erroneously refused to grant a new trial for the purpose of admitting the testimony touching the religious significance of the use of peyote juice in the Indian pueblo. It is said in that connection that the reference to the use of peyote was in some manner an abridgement of religious freedom guaranteed by the first amendment.

The short and conclusive answer is that no question of religious freedom was raised in connection with the relevancy of the cross examination. But even so, it is no deprivation of religious freedom to inquire concerning one's identity with a particular belief or tenet. On cross examination the government developed the local strife and factionalism in the pueblo and that one's opinion of another's truth and veracity was in many instances guided or influenced by his political or religious relationship in the pueblo. We conclude that the trial court did not err in overruling the motion for a new trial on this point.

Finally, a doctor testifying for the government was permitted to testify over the objection of the Appellant concerning the effect of leaving the victim's wound unattended. It was suggested at the time of the objection that while the evidence of the extent of the wound was proper, the extent of the treatment was immaterial. The trial court permitted the doctor to state the probable effect if the wound was left unattended to show "the nature and extent" of the wound.

The testimony was admitted for that purpose and that purpose alone, and while its relevancy for that purpose may be doubtful, the particular circumstances under which it is admitted do not appear to be reversibly prejudicial.

The judgment is affirmed.