72 N.J. Super. 527 (1962)
179 A.2d 78
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIE WALTON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Middlesex County Court, Law Division.
Decided February 16, 1962.
*529 Mr. Gabriel Kirzenbaum, for defendant-appellant
Mr. John Kozak, for the plaintiff-respondent (Mr. Edward J. Dolan, Middlesex County Prosecutor, attorney).
*530 SCHWARTZ, J.C.C.
Defendant Willie Walton was convicted of the charge of assault and battery in the Municipal Court in the Township of Piscataway. The offense was alleged to have been committed upon Susan Feinberg, an infant ten years of age.
Defendant appealed to the Middlesex County Court and a trial de novo was held. The infant, Susan Feinberg, was offered as a witness and was examined on voir dire before being sworn.
The interrogation and responses were as follows:
"Q. Susan, how old are you? A. Ten.
Q. Do you go to school? A. (Nods head yes).
Q. What school do you attend? A. Randolphville.
Q. Randolphville? A. (Nods head yes).
Q. What grade? A. Fifth.
Q. And what is your religion? A. Jewish.
Q. Do you go to Synagogue? A. No.
Q. Do you go to any church? A. (Shakes head no).
Q. Do you know what it means to tell the truth? A. (Nods head yes).
Q. What happens if you don't tell the truth, do you know? A. (No response).
Q. Do you know what happens to people who don't tell the truth? A. (Shakes head no).
Q. Well, do you always tell the truth? A. Sometimes. I don't know.
Q. Well, do you know why a person should tell the truth? A. (Nods head yes).
Q. You'll have to say yes or no, Susan, so that the  A. Yes.
Q.  lady can hear you. Why? A. Because it's the right thing to do.
Q. Do you know what it means to swear by the Bible, to take an oath? A. Yes.
Q. That you swear to tell the truth? A. Yes.
Q. Do you know what that means? A. I think so.
Q. Do you know what happens to people if they swear to tell the truth on the Bible and they don't tell the truth? A. No.
(INTERRUPTION FOR ARGUMENT OF COUNSEL AND INTERROGATION CONTINUED AS FOLLOWS):
Q. You said, Susan, that you don't always tell the truth. Are there any times when you do; or rather, is there any way that you can tell me when you decide that you should say the truth or when you decide that you don't tell the truth? What makes the difference to you? Can you tell me that? A. (No response).
Q. Do you know what I mean, Susan? A. (Nods head yes).
*531 Q. You do know what I mean? A. (Nods head yes).
Q. Can you tell me in what situations you do tell the truth and what situations you perhaps don't tell the truth? A. If it's important, I tell the truth.
Q. Well, what things would you consider unimportant? A. (No response).
Q. Do you understand what I mean? A. (Nods head yes).
Q. In what cases don't you tell the truth? A. I don't know.
Q. You don't know?
(INTERRUPTION FOR ARGUMENT OF COUNSEL AND INTERROGATION CONTINUED AS FOLLOWS):
Q. Susan, do you read the Bible? A. Yes.
Q. How often do you read the Bible? A. I don't know.
Q. Do you know some of the books in the Old Testament? A. Yes.
Q. Will you name some of them. A. Like Psalms
Q. I beg your pardon? A. Like Psalms.
Q. Do you know any other? A. Proverbs.
Q. Proverbs. Can you think of any others? A. (No response).
Q. Do you know what the Bible represents, Susan? A. Yes.
Q. What does it represent? A. God.
Q. Do you believe in God, Susan? A. (No response).
Q. Do you believe in God? A. No.
Q. You don't believe in God? A. (Shakes head no).
Q. Do you believe in the Bible? A. Some parts.
Q. Some parts. Where do you get your teaching of the Bible, at home? A. I don't get teaching.
Q. Well, how did you become familiar with the Bible? You said you were. A. I read it, some parts.
Q. You read it. Where? A. I read it, the beginning of it.
Q. Where? A. At the beginning, and some of the Psalms.
Q. Where did you get this Bible that you read? A. I got it for my birthday.
Q. You have it at home? A. (Nods head yes)"
Defendant objected to the competency of the witness on the theory that she was not qualified under our law. The testimony of Susan was taken expressly subject to authority to be submitted by defense counsel and the prosecutor regarding the competency and capacity of the witness, with the reservation that if the court concluded that the witness was not competent her testimony would be expunged.
The court thereupon allowed Susan Feinberg to be sworn and she testified.
Defendant maintains that Susan does not have the "moral sense of responsibility to narrate the truth and she would *532 not have the consciousness of the duty to speak the truth. She would not understand the evil of lying and that such wrongdoing was punishable." As a consequence defendant moves that her testimony "be suppressed" and presses the initial motion of disqualification of the witness.
The general requirements as to the receipt of testimony by children is that they first be adjudged to possess mental capacity and moral responsibility. Hare v. Pennell, 37 N.J. Super. 558, at p. 565 (App. Div. 1955). "The law fixes no precise age within which children are absolutely excluded from giving evidence."
There is some conflict as to whether the competency of children to understand the obligation of an oath depends on belief with respect to Divine punishment. Some cases hold the witness must feel the obligation of the oath from religious convictions and not merely from the sense of impropriety of telling a falsehood or the fear of bodily punishment. Others are to the effect that tests of competency of children upon religious instruction should be discarded. 58 Am. Jur. 99.
The adjudication of admissibility of a child as a witness is made upon a preliminary examination by the trial court. "It has been settled for a long time that the competency of a child to be a witness is a matter for inquiry by the trial judge and rests largely in his discretion." State v. Gambutti, 36 N.J. Super. 219, 223 (App. Div. 1955). Where an infant is offered as a witness, the general direction of the interrogation is to ascertain the capacity (as a matter of law) of the child to give evidence, i.e., whether there is such discretion and comprehension as would render the testimony of value.
"A consistent view was entertained by the early jurists in this state. In Den v. Van Cleve (1819) 5 N.J. Law (2 Southard) 589, at page 652 Chief Justice Kirkpatrick said:
`These causes [viz. for depriving a person of the privilege of being a witness], so far as they are personal, or go to the capacity of the witness, are principally these three: the want of discretion, as in the case of infants; the want of intellectual powers, as in the case *533 of idiots, lunatics and madmen; and the want of religious principle and belief, as in the case of those who do not believe in the being, perfections and providence of God, nor in a future state of rewards and punishments, where he that beareth false witness, and so taketh the name of his God in vain, shall not be held guiltless.'" State v. Levine, 109 N.J.L. 503, 507 (Sup. Ct. 1932).
The question of the child's "mental capacity" in my judgment presents no problem. She appears intelligent, possesses an awareness and undoubtedly possesses mental capacity; while immature, I conclude she understands the "nature, quality and burdens of an oath." She said she "doesn't always tell the truth," but that she tells the truth "when it is important" "because it's the right thing to do." Such candor and simplicity from a child demonstrated a quality of verity.
Turning to the requirement of "moral responsibility" nothing was disclosed or presented to the court affecting that trait, with perhaps one exception, to be discussed hereafter. An infant's moral responsibility would be presumed, once the mental capacity and understanding of the nature of the oath are established. As to infants, "With respect to their moral responsibility, it has been frequently said that it depends upon their understanding `the nature of the oath.'" State v. Labriola, 75 N.J.L. 483, 485 (E. & A. 1907). No other test of moral responsibility should be applied to an infant, since none such is required, as a preliminary matter, of an adult offered as a witness.
The force of the argument against the testimony of the infant is that she said she didn't always tell the truth and didn't know what happens to people who swear to tell the truth and don't; and that she said "No" when asked if she believed in God. These several answers are not to be extracted and considered apart from the entire context.
The purpose of the oath is to purge the conscience and impress the witness with a due sense of religious obligation so as to secure the purity and truth of the testimony under the influence of its sanctity. 39 Am. Jur. 495.
*534 The examination of the infant is not directed to religious belief as such (since it is presumed), but rather to capacity to communicate observations and experiences; to the capacity intellectually to understand; her comprehension, discretion and intelligence as an aid to the court in determination of the preliminary inquiry. The usual questions touching upon religious training are incidental and merely aid as a criterion. To direct a question to an infant of tender years, on voir dire, as to whether she believes in God or not, cannot necessarily settle the preliminary requirement. No doubt there are legion who would say "yes" as to belief in God, but would be hard put to explain a rational basis for it. A concept by way of belief in God requires a mature mentality capable of forming a belief. We are here dealing with an abstraction regarding the Deity; the nature of the Divine, the Almighty, is a matter on which most believers, I would say, give little thought, if any, and those with positive and settled thoughts vary as to the nature and form. I point this out merely to illustrate that the inquiry cannot, as to an infant, be directed to this question, as an ultimate requirement as to competency to testify. A child witness is not required to possess such intellectual capacity. Any other rule would exclude most infants of tender years. I find Susan mentally capable and morally responsible.
The law prima facie supplies the requirement of belief of a witness. The law presumes that every man in a land where God is generally acknowledged "does believe in Him and fear Him." The burden of proof is not on the party adducing the witness to prove that he is a believer, but on the objecting party to prove that he is not. 39 Am. Jur. 494. Donnelly v. State, 26 N.J.L. 601, 621 (E. & A. 1857). The presumption, in my judgment, is applicable to an infant.
The fact is that Susan stated that she did not believe in God. She said "No" when asked that question.
"Under the common law, no person could be a witness in a judicial proceeding unless he believed that there was a god and that that *535 god would punish him if he swore falsely." State v. Levine, supra, at p. 506
Since there has been no alteration of the common law in this State, except as to a party, that still appears to be the law, unless the holding in State v. Levine, supra, is no longer decisive by reason of the 1947 Constitution.
The witness offered in this proceeding was administered the oath since no one, including a child, can testify as a witness, whether a party or not, unless first administered an oath or affirmation R.S. 41:1-6. Williamson v. Carroll, 16 N.J.L. 217 (Sup. Ct. 1837); State v. Gambutti, supra.
The statute referred to was originally adopted in deference to a religious sect (Quakers) with conscientious scruples against the sacramental or corporal oath, and sheds no further light on the present problem.
In State v. Levine, supra, Associate Justice Case reviewed the history of the law in a learned opinion. The question before the court was the qualification of adult witnesses as well as a party witness, all of whom said they had no religious belief, no belief in the Bible, and no belief in God.
We take the holding of State v. Levine, supra, to be as follows:
1. No person (other than a party) can be a witness, unless he believes that there is a God.
2. A party cannot be deprived of the right to testify regardless of his religious beliefs. ("The constitutional provision is a direction that the belief or disbelief of any person on religious topics shall not debar him from rights which the law affords to others")
3. Those with conscientious scruples (though not disbelievers) may declare, or declare and affirm, R.S. 41:1-6, formerly 3 Comp. Stat. 3772.
4. A party having no religious belief is to be inducted into the witness chair by affirmation. (In the absence of specification by our Legislature, "that form seems appropriate and sufficient" and must have been "the legislative intent.")
There is a presumption that every person over the age of 14, is competent to testify in any cause, civil *536 or criminal. Such presumption, unless overcome by proof, prevails. Children under 14 however, are admitted only if they are adjudged to possess mental capacity and moral responsibility, on a preliminary examination by the trial court. State v. Labriola, supra, at p. 484. This preliminary inquiry is to adjudge whether the anticipated testimony would have any value; whether there was such discretion as the court feels could be accredited, and that the proffered testimony should be heard, to be weighed thereafter as other evidence. This adjudication is for the trial judge, and the inquiry is not restricted by rules of evidence or burden of proof. It is not an issue between the parties at this stage. It precedes factual issue and is but a judicial inquiry.
The qualification of religious belief, on the other hand, has no necessary affiliation with such capacity as a preliminary question. It could conceivably be brought into question at any stage, subject to limitations not necessary to consider here. The customary religious aspect of questions to an infant, on voir dire, are for the purpose of testing capacity and not designed as a probe into religious belief, per se.
Since there is no presumption of capacity of an infant under 14, it must be established, State v. Labriola, supra; but there is a presumption that a person believes in God. Donnelly v. State, supra. A court would have no reason ordinarily to direct questions to a proposed witness as to religious belief. The question of religious belief is not required to be the subject of a preliminary inquiry. As nothing usually appears to affect such presumption, the trier of the fact has no concern with it, and it being a mandatory presumption rather than permissive, because of probabilities, its function continues as a matter of course. While the presumption of religious belief obtains as aforesaid, it is rebuttable, and the burden of overcoming it is on the one who asserts the lack of belief. Cf. In re Weeks, 29 N.J. Super. 533 (App. Div. 1954); Donnelly v. State, supra.
Taking the entire examination, which included the *537 response from Susan that she was "Jewish" when asked her religion, that she reads the Bible, and that the Bible represents God and that she believes in some parts of the Bible, I conclude she has the belief required to render her competent, notwithstanding the one instance where her answer provoked this issue. From the entire examination I conclude that the burden of establishing that she does not believe was not carried.
A votary of the Jewish religion believes in God in a form laid down as a cardinal principle (one of 13) by Maimonides and universally accepted by those of the Jewish faith conversant therewith (Daily Prayer Book (rev. ed. 1960), by Dr. Joseph H. Hertz, late Chief Rabbi of the British Empire).
In State v. Levine the presumption was overcome, since disbelief emanated from the proposed witness and there was no other proof. The witnesses volunteered their disbelief. Here, however, the proof as to disbelief was not volunteered and was inconsistent with other statements. It was to be weighed against the presumption.
Here the witness made inconsistent statements on the matter of belief. No further questioning was directed toward their inconsistency, leaving the presumption and the pertinent questions and answers to resolve the question of her competency on the basis of religious belief. Let it be noted that Susan at no time indicated she had conscientious scruples or objection to take an oath.
The questions for resolution are:
1. Is Susan disqualified as a witness on the ground of religious disbelief?
2. If so, does she have the status of a party so as to come within the exception?
The presumption being that she believes, an apparent contradiction was not sufficient to overcome the presumption.
The state of the law on this subject in New Jersey is anachronistic. Other jurisdictions provide that no person shall be incompetent to testify because of his religious *538 opinions, and they have abolished the requirement of belief formerly existing. In some jurisdictions (as in New Jersey) the oath is optional to those believers who have scruples against swearing and they are allowed to affirm, and in others the oath is abolished and affirmation used as preliminary to testifying, State v. Levine, supra, at p. 508. The trend toward elimination of religious belief as a requirement is deserving of attention in our State. Dean Mason Ladd of the Iowa State University of Law, writing in 10 Rutg. L. Rev. 528 (1955-56), said:
"To accomplish what the Uniform Rules contemplate, the New Jersey statute N.J.S.A. 41:1-6, should be amended to permit a witness without religious belief, as well as the religious person with conscientious scruples against taking an oath, to affirm. It would appear that this New Jersey limitation ought to be changed because it may prevent the court and the triers of fact from having the benefit of testimony often badly needed to arrive at a just decision. Considering the large number of people in our population who are believers but who lack definite convictions upon religious matters or give but limited attention to them, it would seem that to permit them to testify and yet deny others without belief the right to be a witness although they understand and feel their duty to speak the truth is unrealistic. The fear of punishment in the hereafter because of falsifying when under oath, would have to involve extremely deep-seated religious convictions to be more effective upon the conscience of a witness than the fear of a criminal charge for perjury under which the witness would be punished during his lifetime. The object of the oath or affirmation is to stimulate the feeling of responsibility to tell the truth."
Historically, the oath itself played a much greater part than it does today. Deeply religious feeling placed special faith in oaths and miracles. The court procedure in the shire and hundred moots now seems irrational. Anglo-Saxon justice rested on oaths and miracles rather than weighing of evidence in a scientific manner. The accused swore his denial, and the proof ordinarily was left to the defendant by either compurgation or ordeal. By compurgation a stipulated number of compurgators, or oath helpers, swore their belief of defendant's innocence. No alibi or direct evidence bearing on the case was introduced. They *539 resembled today's character witnesses. They were under oath, however, and the penalties for false swearing, both immediate and in the next world, were serious enough for a man to think twice before committing perjury. The ordeal, for more serious offenses, was a religious ceremony based on the theory that if God considered the man innocent He would perform a miracle to rescue him from one of the three favorite ordeals of hot iron, hot water and cold water. Hall and Albion, History of England and the British Empire (3d ed.).
Rules of procedure, cross-examination and burden of proof, and penalty for perjury under existing law require a more realistic approach. Correlation between disbelief and untruthfulness is too slight to constitute the basis of disqualification of a witness.
"In the light of reason and experience" the common law requirement should be abandoned, as it has been in most jurisdictions.
Religious belief should not be a required test of competency. While N.J.S. 2A:84A-24 (Rule 30) does grant a privilege to refuse to disclose religious belief or theological opinion everyone should have the right to testify without being subjected to inquiry as to religious belief, when called as a witness. Nor should the opportunity be available for anyone to evade testifying by stating his disbelief.
Either the lawmakers should unshackle procedure of this ancient dogma, no longer tenable, or the court (of rule making authority) should rescind it. Either one has the power to revise the common law rule if it appears outmoded. Faber v. Creswick, 31 N.J. 234, 241 (1959).
Further, our Constitution altered that of 1844 anent civil rights by adding: "No person shall be discriminated against in the exercise of any civil right * * * because of religious principles * * *." 1947 Constitution, Art. I, par. 5. Prior to 1947 the Constitution merely stated: "No person shall be denied the enjoyment of any civil right *540 merely on account of his religious principles." 1844 Constitution, Art. I, par. 4. Is this to be construed to eliminate the 1844 constitutional requirement of belief in God as to a witness vis-a-vis a party? Is the differentiation in State v. Levine, supra, still maintainable? Since I have already ruled the witness competent, an answer to this is not essential.
Does Susan fall in the classification of a party rather than a witness? Since the first question was decided in the negative, this becomes moot. Nevertheless, I state my view. Technically the State is the party. However, for the purposes required here, and for reasons of public policy, the complaining witness would appear to take on the characteristic of a party. To hold otherwise (in most cases of this nature) would deprive the State of the ability to prosecute where the complaining witness or victim did not believe in God.
The motion to suppress is denied.