79 N.J. 97 (1979)
398 A.2d 76
STATE OF NEW JERSEY, IN THE INTEREST OF R.R., JR., A JUVENILE.
The Supreme Court of New Jersey.
Argued November 27, 1978.
Decided January 31, 1979.
*102 Ms. Andrea R. Grundfest, Assistant Essex County Prosecutor, argued the cause for appellant State of New Jersey (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. Donald S. Coburn, Essex County Prosecutor, of counsel).
Mr. Stanford M. Singer, Assistant Deputy Public Defender argued the cause for respondent (Mr. Stanley C. Van Ness, Public Defender, attorney).
The opinion of the court was delivered by PASHMAN, J.
This case presents for review numerous issues concerning the circumstances under which the testimony of an infant witness will be deemed properly admissible in the course of a court proceeding. First, we must decide whether an infant must be given, and hence understand the significance of, the "traditional" oath administered to adults in order that his testimony be taken. Second, a determination must be made as to whether the particular infant here involved satisfied the competency requirements of Evid. R. 17. Finally, we must address the propriety of the trial court's appointment of the infant's mother to act as his interpreter.
On January 19, 1976, R.R., Jr., a 15-year-old male, was charged with an act of delinquency under N.J.S.A. 2A:4-44. Specifically, the State alleged that R.R. had sodomized a 4-year-old child  an act which, if committed by an adult, would constitute a violation of N.J.S.A. 2A:143-2. A hearing on this charge was held on March 3, 4, and 5, 1976. Three witnesses appeared on behalf of the State: S.M. (Sean), the alleged victim of the offense; L.W., Sean's stepfather; and J.W., the child's mother. The defense presented no witnesses.
Mr. and Mrs. W. both testified that on the evening of January 11, 1976 they had gone to the movies leaving Sean at home in the care of R.R., a cousin of Mr. W., who had in the past frequently babysat for the child. The following day, the W's, noticing that Sean was acting "jittery," asked the child if anything was wrong. Sean replied that he and *103 R.R. had "play[ed] medicine" the previous evening, and then attempted to convey through gestures what had occurred. Sean walked into the bathroom with his stepfather, urinated, and then  pointing to his rectum  stated that R.R. had "mess[ed] with him back there." Sean also stated that R.R.'s actions had "hurted" him. The child's parents understood Sean's actions and words as meaning that R.R. had placed his penis in the child's rectum.
Enraged by what his stepson had told him, Mr. W. decided to arrange a confrontation between R.R. and Sean. At approximately 6:30 that evening, R.R. was summoned to the W. home, ostensibly to watch Sean while the W.'s went shopping. After R.R. had arrived, the couple left the house only to return 10 to 15 minutes later. Sean, in the presence of R.R., then informed Mr. W. that he (Sean) had told R.R. that Mr. W. knew what had occurred the previous evening. R.R. insisted that "it wasn't like that." The juvenile explained that he had been urinating when he heard Sean coughing or crying out and, in his haste to tender to the child's needs, had inadvertently walked into Sean's bedroom with his penis exposed.
Not believing R.R.'s story, Mr. W. told the juvenile that he was either going to summon the police, call R.R.'s mother, or give R.R. a beating. R.R. pleaded with Mr. W. not to notify his mother because she had already beaten him once for "messing" with Sean in the past. Mr. W. then told R.R. to "stand up like a man and fight." A fight thereupon ensued in which Mr. W. definitely had the upper hand.
The only other witness to testify was Sean, the 4-year-old alleged victim of the sodomy. Aside from R.R., Sean was the only person present when the alleged offense occurred, and hence the only witness to render a first-hand account of the events that transpired on January 11.
As soon as the prosecutor informed the court of her intention to call Sean as a witness, counsel for R.R. moved to hold Sean incompetent per se because of his age. That motion was denied. Counsel for R.R. then requested that *104 Sean be sworn. Sean placed one hand on a Bible and the following ceremony ensued:
The Clerk: Will you tell the truth to this Court?
The Witness: Yes.
The Clerk: Do you believe in God?
The Witness: Yes.
The Clerk: If you lie do you believe that God will punish you?
The Witness: No.
The Clerk: God will not punish you if you tell a lie? Or will he punish you?
The Witness: He will.
The Clerk: He will.
The boy is sworn, Judge.
Counsel for R.R. objected on the ground that the above ceremony did not constitute the oath required of all witnesses by Evid. R. 18. He maintained that the child must be administered, and hence must understand the significance of, the "traditional" oath given adult witnesses in order for his testimony to be taken. The court disagreed, stating that the above ceremony did indeed constitute an oath inasmuch as the child promised to tell the truth on pain of future punishment. In its view, the traditional oath was not appropriate for "one so young."
The judge did rule, however, that further interrogation of the child was necessary in order to determine his "understanding [and] his ability to express himself" and thus his competency as a witness under Evid. R. 17. Upon questioning by the court and both counsel, Sean indicated that he attended school every day; that he always obeyed his teacher; that his teacher would scold him if he did things "wrong"; and that he never did things "wrong" when at home. The child was then asked if he knew what it meant to be truthful and what it meant to tell a lie. Sean responded that truthfulness "means to be good" and that if he told a lie, "I be bad." Sean also stated that if he were bad he would "get a beating," and therefore he tried to be good all the time. Finally, Sean indicated that he would not be "bad" when *105 answering questions in court but would instead relate what had happened "the way it [was]."
Following this voir dire, the judge ruled that Sean was not disqualified as a witness under Evid. R. 17. In his view, by equating truthfulness with good and lying with bad and by acknowledging that he would receive a beating if he were bad, Sean understood that it was his duty to tell the truth. The judge also concluded that Sean could adequately express his thoughts so as to be understood by the court.
The State then moved to have Sean's mother sworn to act as an interpreter for her son. The Prosecutor reasoned that in the course of his testimony the child might communicate through idiosyncratic speech patterns and gestures which would be understandable only to his mother. Over the objections of counsel for R.R., the judge granted the motion. He cautioned Mrs. W., however, that her function was merely to convey to the court the messages which her son might communicate, and that she could not prompt or aid Sean in any way. He further informed her that she was to interpret a particular response given by Sean only when requested to do so by the court.
The prosecutor then began questioning Sean as to the events surrounding the alleged sodomy. Sean testified that he remembered the night when his parents had gone to the movies, and that he and R.R. had been alone in the W. home. He indicated that R.R. had awakened him by pushing on his legs and told Sean to "[t]ake it easy." The following colloquy then ensued:
Q: * * * And what did [R.R.] do?
A: (indiscernible)

* * * * * * * *
Q: Say it louder.
A: Back here.
The Court: I didn't hear that.
Mrs. W.: He put his penis back here.
The Court: That's what he did?
Q: And did you have your pajamas on?
A: No.

*106 The Court: The record will show that he pointed to the rear part of his backside.
Sean then went on to explain that R.R. had removed his pajama bottoms and "touched" him on the rear end, and that this touching "hurt" him. Moreover, this touching had occurred more than once.
Sean had no conception of days of the week or dates of the month and, as such, could not testify as to when the alleged sodomy transpired. The child was, however, able to distinguish morning from nighttime, and did state that R.R.'s actions had occurred at night and that R.R. had gotten beaten the following night.
Given the age of the witness, the judge allowed counsel to use leading questions throughout his testimony. It should also be noted that the child's responses to the same questions were at times inconsistent. Finally, the record demonstrates that Sean was confused as to the precise nature of the proceedings being conducted.
At the close of the State's case, counsel for R.R. moved for an acquittal or, in the alternative, for a reduction of the sodomy charge to the lesser included offense of assault and battery. He also moved that Sean now be declared incompetent on the basis of the testimony the boy had in fact given.
R.R.'s motion to strike Sean's testimony was denied. The judge reiterated his earlier conclusion that Sean  by equating truthfulness with good and lying with bad  understood that he had a duty to tell the truth. Although acknowledging that much of the child's testimony had been the product of leading questions, the judge felt that Sean "was not fabricating or fantasizing but that he relayed actually what happened as best he could remember it." Further, despite the child's lack of time perception, the judge concluded that the testimony given by Mr. and Mrs. W. sufficiently established the chronology of events.
*107 Finding that no evidence relating to actual penetration had been adduced, the judge dismissed the sodomy charge. However, he found that sufficient evidence existed to support the lesser included offense of private lewdness (N.J.S.A. 2A:115-1). The defense then indicated that it would produce no witnesses and moved for an acquittal on the lewdness count.
This motion was denied. The judge, as trier of fact, concluded that R.R. had exposed himself to Sean  an exposure neither accidental nor excusable  that the juvenile had also "messed" with Sean's buttocks area, and that Sean had been hurt by these acts. This conduct was labelled "lewd and indecent" and deemed the type of conduct which would constitute a violation of N.J.S.A. 2A:115-1 if engaged in by an adult. R.R. was therefore adjudged a delinquent. The juvenile was placed on probation for one year conditioned upon his attending counseling sessions at Mt. Carmel Guild.
On appeal, the Appellate Division reversed the delinquency adjudication in an unpublished per curiam opinion. Although upholding the trial judge's conclusions as to Sean's competency, the appellate judges ruled that the child's testimony was nevertheless inadmissible because he had not been administered the traditional oath given adult witnesses. An identical holding had been reached by the same panel of appellate judges in State v. Zamorsky, 159 N.J. Super. 273 (App. Div. 1978), a case decided the same day as R.R. The Appellate Division also held that the lower court had erred in appointing Mrs. W. as her son's interpreter. On May 25, 1978, we granted the State's petition for certification. 77 N.J. 501 (1978).

I

The "Oath" Requirement
Evid. R. 18 provides in pertinent part:
A witness before testifying shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by the law. * * * *108 Given the unequivocal language of the rule, it is clear that all prospective witnesses  including infants  must be sworn or affirmed prior to the giving of testimony. See, e.g., State v. Gambutti, 36 N.J. Super. 219, 223-224 (App. Div. 1955); State v. Walton, 72 N.J. Super. 527, 535 (Law Div. 1962); Williamson v. Carroll, 16 N.J.L. 217, 218 (Sup. Ct. 1837). The Appellate Division, in both Zamorsky and the present case, held that the oath required by Evid. R. 18 is the oath in its traditional form, and that a trial court cannot deviate from this form merely because a prospective witness is not an adult. We disagree.

(A)
Although Evid. R. 18 requires that all prospective witnesses be sworn or affirmed, neither that nor any other rule specifies any particular form to which an oath must adhere. This silence sharply contrasts with the explicit manner prescribed for the making of affirmations or declarations. See N.J.S.A. 41:1-6. The absence of any specific oath form  as well as Evid. R. 18's reference to "an" oath, as opposed to "the" oath  demonstrates that the rule was intended to validate any oath ceremony acceptable at common law.
At common law oaths originally constituted a mode of proof rather than a method of enhancing credibility. An accused could be cleared of all charges against him merely upon the sworn testimony that he had not perpetrated an offense. See 6 Wigmore on Evidence §§ 1815-1816 at 380-383 (Chadbourn Ed. 1976). Gradually, however, the concept of oath underwent a change in character. Instead of constituting a form of evidence, courts came to conceive of the oath as a vehicle for strongly reminding a witness of the supernatural punishment in store for him should he testify falsely, thus putting him in a frame of mind calculated to tell the truth. Id. at 382-383; see Omychund v. Barker, 1 Atk. 22, 26 Eng. Rep. 15 (1744).
*109 This being the function of the oath, a witness could not be sworn  and hence could not testify  unless he believed in the existence of a Deity. It mattered not whether the witness was Christian  so long as he believed that a Supreme Being would punish him should he lie. See, e.g., Omychund v. Barker, supra; State v. Levine, 109 N.J.L. 503, 506-507 (Sup. Ct. 1932). Thus, atheists and those who refused to swear before God were deemed incompetent to testify. See, e.g., Omychund v. Barker, supra; State v. Levine, supra, 109 N.J.L. at 506-507; 6 Wigmore on Evidence, supra, at § 1817. In the case of infant witnesses, it was presumed that the child possessed the necessary religious belief. That presumption, however, could be rebutted. See State v. Walton, supra, 72 N.J. Super. at 534-535; 6 Wigmore, supra, at § 1821.
So long as the witness possessed the necessary belief, however, the form in which an oath was administered was immaterial, provided that the ceremony actually employed evinced from the witness a solemn commitment to speak the truth on pain of divine punishment. See Omychund v. Barker, supra; United States v. Looper, 419 F.2d 1405, 1406-1407 (4th Cir.1969); 6 Wigmore, supra, § 1818 at 387. The manner in which a non-christian was sworn was therefore prescribed by his faith. See D. Boland & B.H. Sayer, Oaths and Affirmations 111 (1953). Special oath forms were developed to be used by Scots, Jews, Arabs, Buddhists and Chinese. Id. at 111-115. Moreover, courts confronted with infant witnesses avoided couching oaths "in formal and abstract language." 6 Wigmore, supra, § 1817 at 387.
The common law requirement that a witness must believe in a Deity in order to testify has now been abandoned in all American jurisdictions. See 6 Wigmore, supra, § 1828 at 414-432. In New Jersey the abolition of this requirement came about through Court Rule. Evid R. 18 explicitly provides that *110 * * * No witness may be barred from testifying because of religion or lack of it.
Instead, both the rule and N.J.S.A. 41:1-6 allow the making of affirmations or declarations by those who either do not believe in God or are conscientiously scrupulous of swearing in His name.
Coincident with this liberalization of the religious requirement, courts have come to recognize that fear of divine punishment is not a sine qua non of a valid oath. Rather, the oath is now viewed primarily as a vehicle to remind the witness that he has a special obligation to speak the truth in court. See, e.g., United States v. Looper, 419 F.2d at 1406-1407; State v. McClain, 541 S.W.2d 351, 356 (Mo. App. 1976); State v. Collier, 23 Wash.2d 678, 162 P.2d 267 (Sup. Ct. 1945); McCormick on Evidence § 63 at 141 (2d Ed. 1972). The driving force behind this obligation will still, in some cases, derive from a witness' religious belief. However, it also derives from the witness' knowledge that he can be prosecuted for perjury should he lie. See, e.g., United States v. Looper, supra, 419 F.2d at 1406-1407; State v. McClain, supra, 541 S.W.2d at 356; McCormick, supra, § 63 at 141.
An infant witness may be incapable of understanding either the concept of divine punishment or the legal implications of false swearing. Rather than precluding young children from testifying, however, many courts  recognizing that the main purpose underlying the oath requirement is that of arousing the conscience of the witness  have permitted infants to testify so long as they evince a commitment to speak the truth out of fear of future punishment of any kind. See, e.g., Wheeler v. United States, 159 U.S. 523, 524, 16 S.Ct. 93, 40 L.Ed. 244 (1895) (5 1/2-year-old witness stated that he would not lie for fear of being sent to jail); Fields v. State, 500 S.W.2d 500 (Tex. Cr. App. 1973) (4-year-old feared a spanking if he lied); People v. Carpenter, 3 Cal. App.2d 746, *111 40 P.2d 524 (Dist. Ct. App. 1935) (same); Hill v. Skinner, 81 Ohio App. 375, 79 N.E.2d 787 (Ct. App. 1947) (4-year-old stated that God would not love him if he lied); State v. Collier, supra (9-year-old feared he would be sent to reform school if he lied). See generally, Note, "The Problem of the Child Witness," 10 Wyo. L.J. 214, 217-219 (1956). So long as the oath ceremony actually performed evinces such a commitment, the child has been deemed properly sworn. See, e.g., State v. McClain, supra, 541 S.W.2d at 356-357; State v. Collier, supra, 162 P.2d at 275-276.
We approve of the rationale of the above decisions. As noted earlier, the main purpose underlying the modern oath requirement is that of reminding the witness that he has a special obligation to speak the truth in court. Any ceremony which obtains from an infant a commitment to comply with this obligation on pain of future punishment of any kind constitutes an acceptable common law, and hence a valid Evid. R. 18, oath. It is not necessary that an infant mouth the traditional litany nor comprehend its legal significance. Trial judges are therefore invested with a certain amount of discretion to tailor the traditional litany to fit the circumstances of a particular case.
Indeed, any holding to the contrary would virtually preclude children from testifying against their assailants. Since testimony by adults concerning a child's complaints of criminal activities is generally rendered inadmissible by rules governing hearsay, a requirement that infants comply with the legal formalities of the traditional oath might effectively bar the prosecution of such offenses.
We must also emphasize that allowing departures from the traditional oath will not result in convictions based upon the word of infants incapable of understanding the difference between right and wrong. Infants must still satisfy the competency requirements of Evid. R. 17 in order to testify.

*112 (B)
In the present case, the ceremony performed, see ante at 104, clearly satisfied the requirements of a common law oath. Sean stated that he would tell the truth, that he believed in God, and that God would punish him if he lied. Hence, the ceremony elicited from Sean a commitment to speak truthfully on pain of future divine punishment. As such, the requirements of Evid. R. 18 were met.
One irregularity in the procedure utilized below should, however, be noted. Sean was administered an oath before he had been interrogated as to his qualification as a witness under Evid. R. 17. The swearing ceremony should not have been conducted until after the trial judge was satisfied that Sean was a competent witness. See Evid. R. 8; State v. Grossmick, 75 N.J. 48 (1977), aff'ing o.b. 153 N.J. Super. 190 (App. Div. 1976). This error, however, was completely harmless inasmuch as the judge did conduct a voir dire examination and conclude that Sean was competent prior to the taking of the child's testimony. Moreover, it was counsel for R.R. who demanded that the child be sworn prior to the judge's voir dire. As such, he cannot now be heard to complain about an error which he himself induced. See, e.g., State v. Pontery, 19 N.J. 457, 471 (1955); State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974).

II

Sean's Competency as a Witness
Evid. R. 7 states in part that:
Except as otherwise provided ... (a) every person is qualified to be a witness, and ... (c) no person is disqualified to testify to any matter * * * *.
One exception to this general rule is provided in Evid. R. 17:
A person is disqualified to be a witness if the judge finds that (a) the proposed witness is incapable of expressing himself concerning *113 the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth * * *.
Neither this nor any other rule provides that age per se can render a proposed witness incompetent. See, e.g., State v. Grossmick, supra; State v. Gambutti, supra; Hare v. Pennell, 37 N.J. Super. 558 (App. Div. 1955). Instead, disqualification is warranted only if the requirements of Evid. R. 17 are not satisfied.
Where the competency of a witness is called into question, the judge must conduct a preliminary inquiry into the witness' qualifications. Evid. R. 8; see, e.g., State v. Grossmick, supra; State v. Falcetano, 107 N.J. Super. 383, 387 (Law Div. 1969). The competency determination is primarily entrusted to the trial judge's sound discretion and his decision will not be disturbed on appeal unless it plainly lacks support in the record below. See, e.g., State v. Gambutti, supra, 36 N.J. Super. at 223; Hare, supra, 37 N.J. Super. at 565; Carlotz v. Gavin, 133 N.J.L. 61, 61-62 (E. & A. 1945). However, in determining the propriety of the trial judge's determination, an appellate court need not limit its view to the responses given by the witness during the voir dire examination; instead, it can consider the entire record  including the testimony in fact given by the witness under oath  in order to arrive at its decision. See, e.g., Fields v. State, supra, 500 S.W.2d at 503; People v. Lamb, 121 Cal. App.2d 838, 264 P.2d 126, 130 (Dist. Ct. App. 1953); Note, supra, 10 Wyo. L.J. at 218.

(A) Ability of Sean to Understand the Duty of a Witness to Tell the Truth.

The purpose of the trial judge's inquiry into an infant's understanding of the duty to speak the truth is that of determining whether the child possesses "moral responsibility"  that is, a consciousness of the duty to tell the truth. *114 See, e.g., State v. Grossmick, supra, 153 N.J. Super. at 192; Hare, supra, 37 N.J. Super. at 565; 2 Wigmore, supra, § 506 at 596. It matters not from what source this consciousness derives. So long as the child understands (a) the difference between right and wrong; (b) that to tell the truth is "right"; and (c) that he will be punished in some way should he lie to the court, this requirement is satisfied. See, e.g., Wheeler, supra, 159 U.S. at 524, 16 S.Ct. 93; Hill, supra; State v. Collier, supra; People v. Lamb, supra; Harris v. State, 97 Okl. Cr. 259, 261 P.2d 909 (Ct. App. 1953). See generally, Note, supra, 10 Wyo. L.J. at 218; McCormick on Evidence, supra, § 62 at 140 n. 7.
In the present case, the trial judge's conclusion that Sean understood the duty of a witness to speak the truth is amply supported by the evidence. Sean equated truthfulness with "good" and lying with "bad," and stated that he tried never to be "bad" for fear of receiving a beating. He further indicated that he would tell the court what had transpired "the way it [was]." Moreover, although Sean at times gave inconsistent answers, the record supports the trial judge's conclusion that the child was attempting to recount what had occurred as best he could.

(B) Ability of Sean to Express Himself.

In order to satisfy the competency requirements of Evid. R. 17, a prospective witness must have the ability to "understand questions and to frame and express intelligent answers...." State v. Grossmick, supra, 153 N.J. Super. at 192, aff'd o.b. 75 N.J. 48 (1977). R.R. points to the fact that Sean's responses were at times inconsistent, as well as the utilization of leading questions during his examination, as demonstrating that the child failed to satisfy this criterion.
Having reviewed the record as a whole, we are of the view that R.R.'s contentions in this regard lack merit. It is well-settled that a court may in its discretion allow *115 counsel to use leading questions in order to elicit testimony from an infant. See, e.g., Eberle v. Stegman, 98 N.J.L. 879 (E. & A. 1923); McCormick on Evidence, supra, § 6 at 10. The extent to which such questions are employed bears upon the weight which should be attributed to the infant's testimony by the trier of fact. It is not ordinarily, however, relevant to a determination of whether the infant is competent to testify at all. See, e.g., Eberle, supra, 98 N.J.L. at 879.
In the present case, although counsel often had to rephrase questions in order that Sean could understand them, only a few occasions occurred when either counsel could not get a specific idea across to the child. Moreover, most of the child's testimony was communicated by means of gestures and complete sentences. The trial judge thus acted well within his discretion in concluding that Sean was capable of "expressing himself concerning the matter so as to be understood by the judge...."
R.R. also maintains that Sean's inconsistencies on the stand and the need for counsel to use leading questions in order to elicit his testimony show that the child did not possess an independent recollection of the events that transpired. He cites to numerous cases which hold that an infant witness, in order to be qualified, must initially demonstrate that he possesses an independent recollection of the events which have transpired. See, e.g., Bradburn v. Peacock, 135 Cal. App.2d 161, 286 P.2d 972, 973-974 (Dist. Ct. App. 1955); State v. Ridley, 61 Wash.2d 457, 378 P.2d 700, 702 (Sup. Ct. 1963); Rosche v. McCoy, 397 Pa. 615, 156 A.2d 307, 310 (Sup. Ct. 1959); State v. McClain, 541 S.W.2d 351, 355 (Mo. App. 1976); People v. Lamb, 121 Cal. App.2d 838, 264 P.2d 126, 130 (Dist. Ct. App. 1953). See generally, Note, "The Problem of the Child Witness," 10 Wyo. L.J. 214, 217 (1956). Indeed, the common law rule was that a child, prior to testifying, had to satisfy the judge that he possessed such an independent recollection. See 2 Wigmore, supra, § 506 at 596; McCormick, supra, § 62 at 140.
*116 Evid. R. 17, however, makes the competence of a witness dependent merely upon his ability to "express" himself. The Rule thus abandons the criterion of "independent recollection" as a condition to testifying. Instead, questions concerning the child's recall are now relevant only insofar as they bear upon the weight which the factfinder places upon testimony that has in fact been given.

III

Propriety of the Appointment of Sean's Mother As Her Son's Interpreter
Our Rules of Evidence explictly acknowledge that resort to interpretation may at times be required during the course of a court proceeding. Evid. R. 17 provides in part:
A person is disqualified to be a witness if ... (a) [he] is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him * * * An interpreter is subject to all the provisions of these rules relating to witnesses.
[Emphasis supplied]
An interpreter should never be appointed unless necessary to the conduct of a case. That is, interpretation should be resorted to only when a witness' natural mode of expression is not intelligible to the tribunal. See, e.g., People v. Starling, 21 Ill. App.3d 217, 315 N.E.2d 163, 166-168 (Ct. App. 1974); 3 Wigmore on Evidence § 811 at 277-279 (Chadbourn Ed. 1970); 98 C.J.S. Witnesses § 326 at 27. This is so because no matter how disinterested an interpreter might be, there always exists a possibility that he will inadvertently distort the message communicated by the primary witness.
The overwhelming majority of cases in which interpreters have been employed have involved situations in which either (a) the primary witness was physically incapable of speaking, see, e.g., Kley v. Abell, 483 S.W.2d 625 (Mo. *117 App. 1972) (deaf-mute); Prince v. State, 169 Tex. Cr. 559, 336 S.W.2d 140 (Ct. App. 1960) (deaf-mute); Burgess v. State, 256 Ala. 5, 53 So.2d 568 (Sup. Ct. 1951) (deafmute); 3 Wigmore, supra, § 811 at 279-280; or (b) the primary witness could speak only a foreign language, see, e.g., United States v. Frank, 494 F.2d 145 (2d Cir.1974), cert. denied 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974) (Spanish); People v. Allen, 22 Ill. App.3d 800, 317 N.E.2d 633 (Ct. App. 1974) (Arabic); Lujan v. United States, 209 F.2d 190 (10th Cir.1953) (American Indian); 3 Wigmore, supra, § 811 at 279-280. Nonetheless, other situations may arise in which resort to interpretation is necessary. See, e.g., United States v. Addonizio, 451 F.2d 49, 68 (3d Cir.1971), cert. denied 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972) (witness was unable to speak above a "loud mumble"); Renick v. Hays, 201 Ky. 192, 256 S.W. 26 (1923) (witness has a speech impediment); 3 Wigmore, supra, § 811 at 280 (witness cannot speak loudly enough to be heard). The decision as to whether an interpreter is required  i.e., as to whether a witness' natural mode of communication is unintelligible  is a matter primarily entrusted to the sound discretion of the trial court. His decision in this regard will not be disturbed on appeal unless an abuse of discretion is manifest. See, e.g., State v. Milosh, 5 N.J. Misc. 120, 120-121 (Sup. Ct. 1927); United States v. Addonizio, supra, 451 F.2d at 68; United States v. Sosa, 379 F.2d 525, 527 (7th Cir.1967), cert. denied 389 U.S. 845, 88 S.Ct. 94, 19 L.Ed.2d 111 (1967); People v. Starling, supra, 315 N.E.2d at 167; Kley v. Abell, supra, 483 S.W.2d at 627; 3 Wigmore, supra, § 811 at 278.
In theory an interpreter should be totally impersonal. That is, his role is merely that of a conduit from the primary witness to the trier of fact. As such, he should not aid or prompt the primary witness in any way, nor should he merely render a "summary" of what the primary witness has stated. Instead, as far as is possible, he should translate *118 word-for-word exactly what the primary witness has said. See, e.g., People v. Starling, supra, 315 N.E.2d at 168; Kley v. Abell, supra, 483 S.W.2d at 628; State v. Rodriguez, 110 Ohio App. 307, 13 Ohio Op.2d 79, 169 N.E.2d 444, 451 (Ct. App. 1959); Prokop v. State, 148 Neb. 582, 28 N.W.2d 200, 201-202 (Sup. Ct. 1947); 98 C.J.S. Witnesses § 326 at 27.
Any interpreter selected should also ordinarily be an individual who has no interest in the outcome of the case. This is so because the danger that a primary witness' message will be distorted through interpretation is compounded when the interpreter is biased one way or the other. See, e.g., Kley v. Abell, supra, 483 S.W.2d at 628-629; United States v. Addonizio, supra, 451 F.2d at 68; Lujan v. United States, supra, 209 F.2d at 192; People v. Allen, supra, 317 N.E. 2d at 635; Prince v. Beto, 426 F.2d 875 (5th Cir.1970). Thus, for example, relatives of a party to the proceeding are not usually allowed to act as interpreters. See, e.g., Prince v. Beto, supra; Kley v. Abell, supra. Nor are persons who serve as primary witnesses ordinarily deemed competent to act as interpreters for other witnesses. See, e.g., People v. Allen, supra.
It has been recognized, however, that situations may arise in which it is necessary to appoint an "interested" interpreter. Courts have agreed, however, that such an interested person should not be utilized unless and until the trial judge is satisfied that no disinterested person is available who can adequately translate the primary witness' testimony. See, e.g., People v. Allen, supra, 317 N.E.2d at 635; Lujan v. United States, supra, 209 F.2d at 192; Kley v. Abell, supra, 483 S.W.2d at 629; Burgess v. State, supra, 53 So.2d at 570-571. Even if this requirement is satisfied, however, the trial judge must still interrogate the "interested" interpreter in order to gauge the extent of his bias, and to admonish him that he must translate exactly what the primary witness has said. See, e.g., United States v. Addonizio, supra, 451 F.2d at 68.
*119 When the trial judge in the present case allowed Mrs. W. to be sworn as interpreter, he did not instruct her to translate every answer given by her son. From his voir dire examination of Sean, he had concluded that as a general matter the child could communicate his thoughts without aid. Since the child's stepfather had previously testified that Sean at times employed idiosyncratic gestures and speech patterns, however, the judge felt that during the course of the child's testimony instances might arise in which the court would not be able to understand his communications. It was for this reason that the judge appointed an interpreter. The court made clear that Mrs. W. was to interpret only when the court so requested  that is, only when the court, after considerable effort, would be unable to comprehend the child's responses. Indeed, on only seven occasions during Sean's ensuing testimony did Mrs. W. interject her words into the colloquy between her son and counsel.
As previously noted, resort to an interpreter can properly be had whenever a witness' natural mode of communication is unintelligible to the tribunal. Incomprehensibility due to idiosyncracies of pronunciation and gesture is encompassed within this doctrine. Given the judge's explicit limitation of interpretation to those instances when Sean's responses would in fact be unintelligible, his decision to employ an interpreter was well within his discretion.
The court's use of Mrs. W. as an interpreter, however, is an entirely different matter. Mrs. W. was definitely not a disinterested translator. First, she was the boy's mother. As such, it cannot be doubted that she was desirous of having the juvenile whom she believed had "hurted" Sean appropriately punished. And yet, the judge never held any sort of a hearing to determine whether a "less interested" interpreter was available. Possibly the child's aunt, uncle or other close relative or family friend could have performed this task.
Of greater concern, however, is the fact that Mrs. W. also served as a primary witness. In her role as primary witness, she testified that on the morning following the alleged offense, *120 Sean had pointed to his rectum and stated "back here," and that she understood Sean's actions as indicating that R.R. had placed his penis in the boy's rectum. In her role as interpreter, the following colloquy occurred:
Q: * * * And what did [R.R.] do?
A: (indiscernible)

* * * * * * * *
Q: Say it louder.
A: Back here.
The Court: I didn't hear that.
Mrs. W.: He put his penis back here.
The Court: That's what he did?
Q: And did you have your pajamas on?
A: No.
The Court: The record will show that he pointed to the rear part of his backside.
In effect, Mrs. W., in interpreting the boy's gestures and words, corroborated the testimony she had given as a primary witness. The judge's decision to utilize Mrs. W. as an interpreter therefore amounted to an abuse of discretion.
Although the trial judge erred in appointing Mrs. W. as interpreter, however, it does not necessarily follow that the delinquency adjudication should be reversed. Mrs. W. "interpreted" her son's remarks on only seven occasions. Two of these interpretations were irrelevant to any question at issue in the case. One interpretation was favorable to the defense rather than the State. On two occasions, the judge requested Mrs. W. to interpret because he could not hear what the child had stated. The remarks, however, were sufficiently loud to be heard by the court reporter, for he typed in the boy's answer and then the mother's answer. Both answers coincided exactly. In one instance, the court was not satisfied to rely on Mrs. W's interpretation; he therefore continued to ask Sean about the matter using simpler questions. The answers given by the child to these questions were in accord with the mother's earlier interpretation.
The only instance in which the mother's interpretation may possibly have been harmful in the abstract was that described *121 above, see ante at 120, when Mrs. W. interpreted her son's words and gestures as meaning that R.R. had placed his penis in the boy's rectum. But even in that instance the boy had pointed to his backside. Moreover, a review of the record as a whole shows clearly that this interpretation was harmless. Immediately following this colloquy, the court and the prosecutor continued to ask the boy questions concerning the matter, and the boy's responses indicated that something unusual had occurred and that the boy's pajama bottoms had been removed. Further, the defense was not precluded on cross-examination from inquiring into this matter. Most importantly, the judge, in reaching his conclusions, did not rely on the mother's interpretation, inasmuch as he ruled that the State had failed to prove that penetration had occurred.
Accordingly, the judgment of the Appellate Division is reversed, and the delinquency adjudication reinstated.
For reversal and reinstatement  Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER  7.
For affirmance  None.